STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSE REYES, DEFENDANT-APPELLANT

Argued May 8, 1967—Decided December 4, 1967.

*Mr. Ralph J. Kmiec for* defendant-appellant.

*Mr. John J. Jehl,* Deputy Attorney General, for plaintiff-respondent (*Mr. Albert J. Scarduzio,* Deputy Attorney General in charge of Camden County Prosecutor's Office, attorney).

The opinion of the court was delivered

PER CURIAM. This appeal is from a judgment of conviction of first degree murder. Since the State had waived the death penalty, the jury's verdict recommended life imprisonment and that sentence was imposed. *N. J. S.* 2A:113-4. The prosecution arose from the shooting of defendant's foreman, George Muccigrosso, in the parking lot of their employer, a frozen food packing company, in Winslow Town-

ship, Camden County. At the trial there was no dispute that the victim was killed by shots from a revolver in defendant's possession. The State's position was that the evidence and legitimate inferences therefrom demonstrated an unlawful killing which was premeditated, deliberate and willful. *N. J. S.* 2A:113–2. The defendant claimed not only that the proofs failed to make out a sufficient case of these requisite components of murder in the first degree, but also that the discharge of the gun was accidental and therefore the killing was "by misadventure" and guiltless under *N. J. S.* 2A:113–6.

At the end of the State's case, the defendant moved for a judgment of acquittal of the first degree charge on the basis of absence of proof of the three special elements of that offense. The motion was denied and that action is asserted here as a ground for reversal. The motion also sought dismissal as to second degree murder for want of proof of intent to kill or to do grave bodily harm; it is now conceded, however, that the prosecution did make out a *prima facie* case of that crime based upon homicide with a deadly weapon. The court left second degree as well as first degree murder to the jury as permissible guilty verdicts. After the verdict, defendant moved for a new trial on the ground that the jury's finding was against the weight of the evidence, urging that, on the whole case, the state of the proofs as to first degree murder and the defense of accidental shooting was such that the jury's verdict has to be said to be the result of mistake. The denial of this motion is also claimed to constitute reversible error. The further points defendant makes also relate to alleged trial errors, including the refusal to charge certain requests dealing with the accidental shooting defense.

■ Treating first of the motion at the conclusion of the prosecution's evidence, the broad test for determination of such an application is whether the evidence at that point is sufficient to warrant a conviction of the charge involved. *R. R.* 3:7–6. More specifically, the question the trial judge

must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. *State v. Fiorello,* 36 *N. J.* 80, *pp.* 90–91 (1961), *certiorari* denied, 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed. 2d* 396 (1962).

 The trial court did not decide the motion by applying this test, but rather, in line with the prosecutor's argument at the time, ruled that the matter of the *degree* of homicide is a question of fact for the jury. This was an erroneous approach, but if denial would be correct on application of the proper standard, the action should be affirmed. (The defendant makes no point here of the improper basis of decision below and the State does not seek to justify the denial of the motion on the basis urged there by the prosecutor). In such a situation, the obligation of a reviewing court is to consider the State's proofs from the proper standpoint and determine therefrom how the motion should have been decided. In so doing, under the current state of our law, no consideration may be given to any evidence or inferences from the defendant's case. *State v. Fiorello, supra,* 36 *N. J.,* at *pp.* 86–87.

The State's evidence may be summarized as follows:

The defendant was a general laborer at the factory. According to Juan Pagan, a fellow employee, the two had previously talked about going to Florida to work. On November 4, 1964, the day before the shooting, Pagan asked the defendant while they were at work to go with him then. Defendant agreed and they left the plant in his car about 8:30 A. M., walking off their jobs without telling anyone. They proceeded to their respective homes, obtained clothing and started for Florida via Philadelphia. They lost their way in that city and the defendant became worried about his wife, so they returned home. Pagan went back to work the next morning because Muccigrosso sent a message

through the witness' sister that he was to do so. Between 6 and 6:30 that morning, he met the defendant in the plant lunchroom who told him that he was going to change his clothes to a work uniform and go to work too. Pagan did not see defendant after that conversation. He gave no testimony that defendant said he had received a similar message to return to work and nowhere in his testimony was anything said about a gun.

The assistant plant manager, Howard Daltry, testified that on November 4, Muccigrosso advised him that defendant had not returned to work from a coffee break and that later in the day he removed defendant's card from the time clock rack and replaced him with another laborer. He stated that, removal of the time card was required practice when an employee walked off the job, but he did not thereby discharge the defendant. Both he and Muccigrosso had the power to discharge.

Daltry was the principal witness with respect to the shooting. He said that he drove into the plant parking lot about 6:40 A M. on November 5 and was followed by Muccigrosso in his car. Both parked and started to walk separately to the plant entrance door. The defendant then pulled into the lot alone in his car, although his wife, who also worked at the plant, generally came with him, and stopped near where Muccigrosso was walking. The import was that the defendant had followed Daltry and Muccigrosso into the lot from the highway. The latter went over to defendant's car and stood outside the driver's door. He then called to Daltry: "What about this fellow?", to which Daltry replied: "As far as I know, he is discharged", and continued walking toward the entrance. Three shots rang out almost immediately, Muccigrosso came staggering toward him crying that he had been shot, and the defendant speedily backed his car out of the lot and went down the highway toward Hammonton. Daltry said he did not hear any conversation that might have taken place between the victim and the defendant and did not witness the actual shooting. Another em-

ployee witness, who was sitting in his truck, with the motor running, near the scene, saw the defendant stop his car in front of Muccigrosso and saw the latter go toward the car, lean down into the window and talk to the defendant. He was not able to overhear any conversation and did not see the shooting, but heard three shots.

About 7:20 A. M., the defendant came into Hammonton police headquarters and said that he had shot a man. Notice of the shooting had been received over the police radio a few minutes earlier. The on duty officer saw a pistol handle in the right pocket of the jacket defendant was wearing and took the gun from him. In answer to the officer's question, the defendant said it was the gun used in the shooting, and then broke down and cried. The State Police station having jurisdiction at the site of the shooting was notified and defendant was held in custody pending the arrival of a detective from that force.

The State's scientific evidence showed that the revolver had been fully loaded and when taken from the defendant contained three expended cartridges and two which had not been fired. The bullets from two of the spent cartridges were found in the victim's body and the third, although it had passed through his clothing, had not entered his body but had struck another car in the parking lot. The physician who performed the autopsy testified that the two bullets caused almost instant death. One entered the upper chest four inches above the left nipple and took a right and downward course through the heart and right lung, demonstrating, according to the doctor, that the weapon when discharged would have had to be above and to the victim's left of the bullet hole and pointing to his right. The other shot entered the central back and went through the right lung. Although no opinion was expressed as to which bullet was fired first, there was evidence that the first shot could have spun the victim's body around so that the second bullet would enter the body from the side opposite the first. The proof also showed powder burns on the inside of the right

pocket of defendant's jacket and a hole through it, demonstrating that at least one, if not all, of the shots had been fired with the pistol inside the pocket. There was no testimony as to whether there were any bullet holes through any part of the car.

■ Considering these proofs in accordance with the test earlier set forth, there is enough testimony and reasonable inferences of a character from which a jury could, beyond a reasonable doubt, find proof of all the elements of murder in the first degree, thus requiring denial of defendant's motion. There was nothing in the State's case to indicate that the discharge of the gun was accidental.

■ Consideration of the contention that the new trial motion was erroneously denied requires mention of defendant's evidence. In some respects and accepted, in part at least, by the State in its summation, fact was supplied for what had been inference, thereby giving a slightly different cast to the case and even strengthening the State's position. According to defendant's wife, who did not know at the time why defendant had walked off the job, Muccigrosso came to her that afternoon and said: "Tell your husband to come back and see me tomorrow and I'll see if he has his job." She so advised the defendant that evening. The next morning they went to the plant together, parking the car in his usual spot, and entered the plant by 6:30. Defendant was surprised when his time card was not in the rack and she reminded him he had to see one of his bosses. At that time she said he was not wearing the jacket, which was lying on the back seat of the car. There was no mention of a gun. This version of defendant's arrival at the plant was generally corroborated by other co-workers, one of whom also testified that defendant asked him if Muccigrosso was there and after he replied that he hadn't seen him, the defendant left the packing room where this conversation took place.

The defendant's own testimony, generally in accord with that of Pagan, his wife and the fellow employees on events covered by those witnesses, also dealt with the gun and the

shooting itself. He said he had loaded the gun and put it in his jacket pocket the day before when he gathered his clothes together for the Florida trip. When he returned home and took his clothes back into the house, he forgot about the gun and it remained in the jacket on the back seat of his car, where he always left that article of clothing. The next morning he did not put on the jacket when he and his wife drove to work. When his card was not in the rack, he knew he had no job and that he would have to see Muccigrosso, as his wife had said. When he didn't find the latter inside the plant, he decided to go elsewhere to see about a year round job which another employer had promised him. He put the jacket on when he reached the car because he felt cold, but did not zipper it closed, and found the gun in the pocket. He was on his way out of the plant parking area when he saw Muccigrosso walking toward the plant entrance door. He stopped the car, turned the motor off and called "Hey George, what about my job?" He claimed not to have heard any response and not to have seen Daltry. He said that he had one hand in each jacket pocket because they were cold, but did not have the gun inside the hand in that pocket, and that Muccigrosso then walked over toward the open window on the driver's side—"he come like he was mad or something, but he tried like, you know, come forward like that like he want to grab me and then when I get scared I saw him, you know, I get scared and when I jump back in my seat, the gun went off." He heard only "one bang" and, seeing Muccigrosso running toward the building, was scared that a bullet had struck him and immediately drove off. He specifically denied any intention to shoot or hurt the foreman or that he ever took the gun out of his pocket or pointed it at the victim. He claimed not to know how the gun went off. This account also constituted the sole evidential basis of the defense of accidental shooting.

A verdict shall not be set aside by the trial court as against the weight of the evidence on a motion for

a new trial "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion". *R. R.* 3:7–11(b). On the whole case, there was ample evidence of the requisites of first degree murder, even if the defendant met up with Muccigrosso on the way out of the parking lot rather than by following the latter in and, as the State· said in summation, even though the intent to shoot the victim was not formed and weighed until after defendant had stopped the car and asked about his job. The jury did not have to believe the statement that he did not hear the reply. No particular length of time is necessary for the formation and weighing of a design to kill. *State v. Coleman,* 46 *N. J.* 16, 45 (1965), *certiorari* denied, 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed. 2d* 212 (1966). Moreover, it would be most difficult for any jury to believe defendant's claim that the firing of the gun was accidental. Even if the jury gave credence to defendant's story of how he happened to have the loaded revolver with him, the uncontradicted physical facts shown on the State's case thoroughly belie the contention that it was discharged three times without a finger on the trigger and without direction. It is clear that the motion for a new trial was properly denied.

▪ Defendant's requests to charge on the subject of misadventure were designed to call to the special attention of the jury that if the decedent had been shot accidentally, he should be found not guilty. Although the record furnished us is not complete in this respect, we will assume for present purposes that these, as well as other charge requests to be mentioned, were appropriately presented and refused. We do not see how defendant suffered any "wrong or inury" thereby. *R. R.* 1:5–1(a). It is evident to us that the jury could not fail to realize, without any specific instruction on the subject, that if it should believe defendant's tale of an accidental shooting, it was bound to return a not

guilty verdict. It knew this was the defense and the contention had been fully discussed in the summations. Moreover, the court did instruct that, in order for the jury to find defendant guilty of any of the offenses specified, the State had to prove beyond a reasonable doubt all of the essential elements thereof, which were spelled out in detail. It would be obvious to the jury that "accident" was the exact opposite of these necessary elements. In addition, the court said that the verdict would be not guilty if the State had not proved its charge beyond a reasonable doubt. All of this was adequate under the circumstances.

Error is also claimed in the admission of three photographs of the decedent taken shortly after death. They were not unduly gruesome and two of them were definitely probative in demonstrating the location of entrance of the bullets, which had been orally testified to by the physician who performed the autopsy. We do not find them inflammatory and the trial judge did not exceed his discretion in admitting them. *State v. Coleman, supra* (46 *N. J.*, at *pp.* 26–27).

Defendant further asserts reversible error in the admission of the testimony of the Hammonton police officer that, after defendant had come into headquarters and volunteered he had shot a man, the officer saw the pistol handle in his pocket, took it out of the pocket and asked "if he used this gun in the shooting", to which defendant replied "yes." The argument is that an incriminating statement as to ownership and use of the gun was elicited without a warning to defendant of his right to remain silent. Admittedly, there was no objection at the time and plain error, *R. R.* 1:5–1(a), has to be relied upon. It may be noted that defendant's own version of what took place was slightly different and weaker from his point of view: After he volunteered that he thought he had shot a man, the police officer asked where the gun was; "I said here * * *, then they took the gun from my pocket."

Both the offense and the trial here took place after *Escobedo v. State of Ill.,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964), but before *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966). See *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966). Regardless of this fact, we fail to see any realistic violation of defendant's rights, let alone plain error. His volunteered admission that he had shot a man gave rise to the right to arrest and to search his person incidental thereto, thereby disclosing the gun, which the later scientific evidence clearly linked to the shooting. As we said in *State v. Gosser,* 50 *N. J.* 438 (1967), the precise sequence of events is not significant. One could hardly sensibly require a police officer, to whom a volunteered statement of a shooting has been made, to do more in the first moments thereafter than immediately ask about and take the weapon for his own protection.

Defendant's final point is that the trial court erred in denying his requests to charge concerning the effect of alleged evidence of his good character and background. These requests stated that such evidence in and of itself may be sufficient to raise a reasonable doubt as to premeditation and deliberation with respect to first degree murder and as to "malice" and criminal culpability with respect to any lesser degree of homicide. The only evidence pointed to by defendant on this subject, almost entirely from his own testimony, was that he, 22 years of age at the time of the shooting, had then been married for about a month, had been employed at this plant for about three and a half months (his wife worked there too), had never been convicted of a crime, and had received an honorable discharge from the United States Army following two years service. All this proof came into the case quite incidentally and without objection, including the introduction in evidence of the military discharge papers. Defendant offered no proofs of reputation or opinion as to character and there was no indication until the requests to charge were presented that the evidence referred to was in-

troduced in an effort to ground a claim of good character. The State made no attempt to offer any rebutting evidence on the subject.

As Wigmore puts it:

"There are two distinct problems of evidence about Character, in which the common use of one word for two ideas has caused confusion: (1) Is a *person's disposition*—*i. e.* a trait, or group of traits, or the sum of his traits—*relevant* and admissible for certain purposes? (2) Whenever it is so admissible as an evidentiary fact and thus becomes in its turn a proposition to be proved, *how is it to be evidenced,*—by the community's reputation, and by that only, and on what conditions?

The first question is essentially one of Relevancy, * * * The second question, however, is raised in an entirely different quarter; it has nothing to do with character as an evidentiary fact, but with the mode of proving character. * * *" Wigmore, *Evidence*, § 52, *p.* 446 (3rd Ed. 1940).

See also McCormick, *Evidence,* § 153 (1954).

Wigmore goes on to say:

"* * * a *defendant* [in a criminal case] *may offer his good character* to evidence the improbability of his doing the act charged, unless there is some collateral reason for exclusion; and the law recognizes none such." Wigmore, *supra,* § 56, *p.* 450.

McCormick expands the latter thought this way, after pointing out at *p.* 333 of his treatise that the prosecution "is forbidden to initiate evidence of the bad character of the defendant when offered merely to show that he is a bad man and hence more likely to commit a crime":

"So it is generally agreed that the accused in all criminal cases may produce evidence of his good character as substantive evidence of his innocence. In courtroom parlance this is often termed 'placing his character in issue,' but the phrase is misleading. Character is almost never one of the ultimate issues or operative facts determining guilt or innocence. It is merely circumstantial evidence bearing on the probability that the accused did or did not commit the act charged with the required guilty intent. What the accused does, then, and what he has the exclusive power to do, is to initiate, and thus open the door to, circumstantial evidence of character.

Character for what? A few courts permit proof of 'general good character' but the prevailing and more practical view limits the inquiry to the trait or traits involved in the crime on trial—honesty in theft cases, peaceableness in murder, and the like." McCormick, *supra*, § 158, *p*. 333–334.

It may be noted parenthetically that problems of the type before us generally arise in two contexts (apart from the initial matter of admissibility of particular evidence which is not involved in this case)—one, as here, whether the defendant's evidence is sufficient to require a charge along the lines requested, and two, whether his evidence is sufficient to allow the prosecution to introduce rebutting proof. (We are not, of course, dealing with the matter of impeachment of a defendant who has offered himself as a witness.)

New Jersey has consistently held to the view that evidence of a defendant's good character can be demonstrated only by proof of his reputation at the time of the offense in the community where he is known for the specific trait involved in the crime (or perhaps generally of a disposition contrary to the act charged, particularly where that act is such as to make difficult or impossible specification of the precise trait of character) and not by opinion evidence as to character based on observation or by testimony as to specific acts or conduct reflecting his character. See *State v. Baldanzo,* 106 *N. J. L.* 498, 502, 67 *A. L. R.* 1207 (*E. & A.* 1930) ; *State v. Danser,* 116 *N. J. L.* 487, 491–492 (*E. & A.* 1936) ; *Ippolito v. Turp,* 126 *N. J. L.* 403 (*Sup. Ct.* 1941) ; *State v. Barts,* 132 *N. J. L.* 74, *pp.* 87–88 (*Sup. Ct.* 1944), affirmed o. b. 132 *N. J. L.* 420 (*E. & A.* 1945) ; *State v. Steensen,* 35 *N. J. Super.* 103 (*App. Div.* 1955) ; *State v. Gambutti,* 36 *N. J. Super.* 219, 232 (*App. Div.* 1955) ; *State v. Sinnott,* 24 *N. J.* 408, 420 (1957). Consonant with this view are the holdings that a defendant's certificate of honorable discharge from the armed forces or a "good conduct medal" is not admissible as evidence of reputation. *State v. Sbrilli,* 136 *N. J. L.* 66 (*Sup. Ct.*

1947) ; *State v. Unger*, 103 *N. J. L.* 18 (*Sup. Ct.* 1926), affirmed o. b. 104 *N. J. L.* 448 (*E. & A.* 1928).

██ Regardless of any question of admissibility, it is clear that the proofs relied on by defendant to ground the requested charges are insufficient for that purpose under our case law to date. Evidence Rule 47, effective September 11, 1967, does provide for two additional modes of proof of character, but we need not consider the scope of this rule, since it certainly does not encompass the type of proof defendant relies on here.

The position defendant asserts, that he "placed his character in issue" by the previously summarized evidence of his past life standing alone, not only goes far beyond present law in this state, but also beyond that generally followed elsewhere. See 1 *Wharton's Criminal Evidence*, § 221, *pp.* 458–459 (*12th Ed.* 1955). While there are cases implying that such testimony is enough for that purpose (see *Holland v. United States*, 245 *F. 2d* 341, 343 (*5th Cir.* 1957) ; *Clarke v. State*, 183 *S. E.* 92 (*Ga. Ct. App.* 1935) ; *Krotkiewicz v. United States*, 19 *F. 2d* 421, 424 (*6th Cir.* 1927) ), most decisions adverting to the point indicate otherwise. See *e. g., Burgess v. State*, 210 *Ga.* 91, 78 *S. E. 2d* 33 (1953) ; *People v. Hinksman*, 192 *N. Y.* 421, 85 *N. E.* 676 (1908) ; *Commonwealth v. Coleman*, 402 *Pa.* 238, 166 *A. 2d* 525, 528 (1961) ; *cf. Martin v. People*, 114 *Colo.* 120, 162 *P. 2d* 597 (1945) ; *State v. Ewing*, 174 *Or.* 487, 149 *P. 2d* 765 (1944). When it is recalled that the fundamental reason for "character evidence" is its probative value on the unlikelihood of the particular defendant having committed the crime charged, the latter view appears to be the sounder. It therefore seems correct to say that the past life evidence defendant points to, in and of itself, should not be sufficient to require jury instructions of any kind relating to the matter of the defendant's character. There was clearly no error in refusing the requested charges here.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.