729 A.2d 507 (1999)
STATE of New Jersey, Plaintiff-Respondent,
v.
Louis P. URCINOLI, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 12, 1999.
Decided June 2, 1999.
*509 Ivelisse Torres, Public Defender, for defendant-appellant (Michael C. Kazer, Designated Counsel, on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Christine M. D'Elia, Deputy Attorney General, on the brief).
Appellant filed a pro se supplemental brief.
Before Judges PETRELLA, CUFF and COLLESTER.
*508 Opinion of the court was delivered by COLLESTER, J.A.D.
Tried to a jury, defendant was convicted of murder, conspiracy and two counts of attempted murder. He was sentenced to an aggregate term of life imprisonment plus twenty years, with forty years of parole ineligibility.
The State's proofs in summary were that on March 12, 1995, defendant, then age nineteen, murdered sixteen year old Nicole Russo in his Seaside Park apartment by bludgeoning her with a crowbar, slitting her throat and dismembering her for disposal. Her body was never found. The State also contended that Urcinoli confessed Nicole's murder to his uncle and later, while in jail awaiting trial for murder, conspired with another inmate to murder his uncle and his uncle's family to keep him from testifying.
In late February 1995, Nicole Russo began dating defendant, who became a nightly dinner guest at the Russo home. Although defendant was three years older than their daughter, Mr. and Mrs. Russo did not disapprove of the relationship since Nicole was mature for her age and because defendant was well-dressed, soft-spoken and more mature than Nicole's other boyfriends. Her parents knew that Nicole had spent the night with defendant on several occasions.
On March 11 defendant dropped off Nicole at the Russo house and left. Half an hour later Brian Markowski, Nicole's old boyfriend, came by her house to see her. When defendant reappeared, Brian left because Nicole was uncomfortable. He returned an hour later after defendant left and went for a walk with Nicole.
Later Mr. and Mrs. Russo returned to their home and saw defendant sitting in his car outside the house waiting for Nicole. About forty-five minutes later, Nicole returned, crying as she came into her house. She told her mother that she had made a decision about whom she wanted to date and that she had told the defendant that she was going back to Brian.
The following morning, March 12, 1995, defendant called Susan Stanger, a former girlfriend, at about 9:00 a.m. and told her that he was worried that Nicole was going to leave him for her former boyfriend. He asked Stanger to be with him because he needed consolation. She declined and hung up. Defendant called *510 her back and asked her what he should do because Nicole wanted time to decide whether she wanted to be with him or with Brian. Stanger advised him to give Nicole time to decide.
Defendant appeared at the Russo home that day between 9:30 a.m. and 10:00 a.m. and left after a short conversation with Nicole. Later that morning Nicole was out walking and holding hands with Brian when defendant drove up to them. Defendant asked Brian to ride with him to discuss matters, so Brian got into the car and rode off with him for a few minutes. Brian testified that defendant wanted him to "back off from Nicole. When Brian said that it was up to Nicole, defendant asked him if he wanted to fight. After Brian declined, defendant drove back to rejoin Nicole. Nicole took defendant aside to talk, and he then drove off. She said to Brian that she had just told the defendant that she wanted to be with Brian and not with him.
About 1:00 p.m. Nicole, Brian and Frank Quigley were at Brian's grandmother's house to say goodbye to Brian before he went back to his home in Brooklyn. Nicole and Quigley then went back to her home. Defendant arrived dressed up at about 2:00 p.m. and reminded Nicole that she had promised to go with him to his mother's home in Hauppauge, Long Island that day. Quigley testified that Nicole was hesitant but finally agreed. She left wearing a gray skirt, a dark shirt, white stockings and white sneakers. She was carrying maroon jeans, a dark shirt, her father's green silk jacket and a knapsack with Mickey Mouse faces on it which she used as a purse. She agreed to call and let her parents know if she would be staying overnight. Nicole never called and was never seen or heard from again after she drove off with defendant in his maroon Subaru.
Since Nicole did not call that Sunday night, her father called her school the following day to see if she had gone straight there from Long Island. He was told that she had not arrived for school. At that point Mr. Russo then looked up defendant's pager number in Nicole's address book and called the number. Defendant called him from Long Island a few minutes later and told him that he had driven Nicole to Brooklyn the night before. He said he dropped her off at about 9:30 p.m. at 93rd Street and 7th Avenue because Nicole wanted to go to Brian's house to pick up a pager that belonged to her. She was to page defendant when she wanted him to pick her up, but she never did.
Mr. Russo asked how defendant could have left Nicole on the street in Brooklyn when she was in his care, and defendant responded that he and Nicole had had an argument and that she got out of the car with her radio and her clothes in her arms. He said that he assumed she went to Brian's house just a few blocks away. When Mr. Russo asked defendant if Nicole still had her backpack with her, defendant said that she must have left it back in his apartment in New Jersey. Defendant offered to return to New Jersey to help look for Nicole, and Mr. Russo agreed to the help.
Mr. Russo called Nicole's pager number with no response and then called Brian's pager. Brian called and said he had no idea where Nicole was, but that he and his family would start looking for her in Brooklyn. Mr. Russo again paged defendant to tell him when he responded that Nicole was not in Brooklyn and ask if defendant would come back to New Jersey to help look for Nicole. Defendant agreed, but he did not show up that Monday or the following day.
At 6:00 p.m. on Monday, March 13, Mr. Russo called the Brick Township Police Department to report that his daughter missing. He spoke to Detective John Bender of the Juvenile Division and narrated the events of the previous two days. He also recalled for the detective that defendant had told him that day that when he and Nicole left the Russo home on Sunday that they went first to his apartment *511 and then to the car dealership where he worked to pick up a van so that he could move some furniture. Mr. Russo also told the detective that it was strange for Nicole to leave her backpack at defendant's apartment since she used it as a pocketbook and never went anywhere without it. The missing persons report filed by Mr. Russo described his daughter as "confused and lovesick."
After his conversation with Mr. Russo, Detective Bender paged defendant, who called him fifteen minutes later. Bender told defendant he was looking for Nicole, and defendant told him the same story he had told Mr. Russo. He also gave his New Jersey address as 1865 Northeast Boulevard in Seaside Park. Later Bender called the Seaside Park police and learned that there was no such address.
On Tuesday, March 14, Bender called the Hauppauge police and asked them to check on defendant's mother's apartment. He received a report that the neighbors saw defendant and his mother, but no girl. Later that day the Hauppauge police visited defendant's mother, Francine Mancuso, in her apartment, and she allowed the officers to look around. She also told the officers that no girl had been there since Sunday.
After getting this information, Bender tried to page defendant repeatedly, but he did not answer the pages. Since Mr. Russo had told him that defendant was employed by The Auto Shop, a car dealership in Toms River, Bender contacted the owner, Fred Wild, who told him that defendant had called saying that he was at his mother's home and would be there a few days. Bender was told that on Sunday, March 12, in the afternoon, the defendant had taken a white van from the premises. Investigation later disclosed that defendant got gas for the van from a Sunoco station in Toms River between 6:00 and 7:00 p.m. that Sunday. The gas station attendant saw no girl in the van.
On Wednesday, March 15, Mr. Russo found out from one of Nicole's friends that defendant lived at a motel in Seaside Park. He went first to the Oceanside Motel and showed Nicole's photo graph to the manager, who recognized Nicole and directed Mr. Russo to an apartment at the Parkside Motel around the corner. From the outside of the apartment Mr. Russo noticed a Knights of Columbus "St. Paddy's Day" sticker on the window sill, and he knew that Nicole had such stickers. When he knocked on the door, no one answered. He went to the owner's apartment and left a message to contact either himself or Detective Bender.
Mr. Russo called Bender the same day with defendant's real address at the Parkside Motel. Bender called the owner, William Hansen, and told him that he was investigating a runaway who was the girlfriend of one of Hansen's tenants. Bender asked to be let into defendant's room because it was believed that there was a "strong possibility that Nicole was in that room."
Hansen had known defendant since 1992. In March 1995, defendant had moved from one of Hansen's other properties to the Parkside Motel, renting an efficiency apartment on a week-to-week basis from Sunday through Saturday. The rent was due in advance, and as of that Wednesday, defendant had not paid the rent for the week, but Hansen said defendant was often late but always paid the rent.
Detective Bender met Hansen and a maintenance worker, Kenneth Brower, at the motel. After no one answered, Brower opened the room with a passkey. But Hansen and Brower immediately commented that the carpet and two sofa cushions were missing. Brower told Detective Bender he had been in the apartment the week before and that the carpet and cushions had been there.
A woman's blouse and pants were on the couch. Men's clothes were hanging from a rack. School books with Nicole's name on them were on a table. When Bender went *512 into the bathroom, he saw the Mickey Mouse backpack under the vanity.
Bender then called Mr. Russo from the apartment and told him that although his daughter was not there, her things were. Bender was convinced that Nicole was staying in defendant's apartment.
At 8:00 that night, Bender went back to the Parkside Motel to see if Nicole had returned. He met Robert Romaniello, who lived next door. After being shown Nicole's picture, Romaniello identified Nicole's picture and said he first saw her on March 6 when she helped defendant move into his apartment. He said that at about 5:00 p.m. on Sunday, March 12, he saw defendant and Nicole drive up in a maroon Subaru and enter the apartment. He described Nicole wearing clothes similar to those she wore when she left her home.
Romaniello said that after defendant and Nicole went inside the apartment, he sat outside on a bench directly underneath defendant's window to wait for friends to arrive for a planned barbeque. As Romaniello sat with the back of his head up against the wall, he heard muffled voices. A couple of minutes later defendant walked outside and asked Romaniello how he was doing. Defendant went back into his apartment and immediately emerged, closing the door behind him, and walked around the corner toward the 7-Eleven store. Although the temperature was only about forty or forty-five degrees, he was only wearing an open flannel shirt, ripped jeans and had on no shoes or socks.
Romaniello walked to the corner to look for his friends and saw that defendant had gone to the 7-Eleven. About five minutes later, defendant returned to his apartment with a bag in his hand and closed the door. Romaniello sat outside for about forty-five minutes and then went back into his apartment. At about 6:00 p.m. he walked over to the 7-Eleven and saw the defendant using the payphone outside of the store, which struck him as odd because he knew that defendant had a phone in his apartment. He noticed that defendant was wearing a different pair of jeans, with no shirt, socks or shoes.
At about 6:00 p.m. Anthony Getchins received a phone call from defendant asking for his brother, Bob. Anthony told defendant that Bob was not there and asked if he could help. Defendant told him that he had done something bad but could not talk about it. Anthony said that defendant's speech was slurred and he was crying. He said, "I just want to die." When Anthony asked if he was drunk, the defendant told him "yes" and hung up the phone.
Romaniello saw the defendant slam the phone down and walk back to his apartment. Romaniello returned to his apartment and watched a movie. He fell asleep and was awakened at about 8:30 p.m. by a vehicle with a loud muffler. Thinking that it may have been his friends, Romaniello looked outside and saw a white van parked behind his car. He no longer saw defendant's Subaru.
At about 9:00 p.m., Romaniello heard a loud thud on the adjoining wall to defendant's apartment, which he described as someone or something being slammed against the wall. At about 10:30 or 11:00 p.m., Romaniello saw defendant leave his apartment, open the van's side door, re-enter his apartment and return with a roll of carpet over his shoulder. Defendant turned the carpet around, placed it in the back of the van, closed the van door and drove off.
Recalling the missing carpet along with defendant's odd behavior as described by Romaniello, and the inconsistency of defendant's story that he had dropped off Nicole in Brooklyn at 9:30 p.m. when Romaniello saw him in Seaside Park at that time, Detective Bender began to realize that the case involved more than a runaway girl hiding at her boyfriend's apartment. After paging defendant again with no response, he called the Major Crimes Unit of the Ocean County Prosecutor's Office.
*513 Search warrants were signed the following day based on Bender's affidavit for both defendant's apartment and the Ford van, which was located in Hauppauge and flatbedded back to New Jersey. At defendant's apartment investigators recovered a pair of size six red jeans, a black shirt and a green jacket found on a bloodstained couch. The Mickey Mouse backpack was under the bathroom sink. Bloodstains were located on the bed frame, a chair, the bureau and the door frame. A presumptive test for blood was performed which revealed blood in the bathroom and in the kitchen drains. On the bed were a pink and a white shirt, which also appeared positive for blood.
Jeffrey Thompson of the Ocean County Sheriff's Department performed a Luminol test on the apartment. Luminol is a chemical reagent that causes a luminescence to appear if blood is present. Thompson testified that the test revealed blood on the lower portion of the front door and floor area, the side, front and top of the dresser, the side of the television, the floor and wall, near the couch and most of the kitchen and bathroom floors. In many areas the Luminol showed a circular wiping motion, causing Thompson to conclude that a great deal of blood had been cleaned up.
While the presumptive test for blood in the van was negative, an analysis was made of fibers vacuumed from the van and of fibers taken from a control piece of carpet left in the defendant's apartment. Thomas Lesniak, a senior forensic scientist with the State Police Crime Lab, testified that the fibers from the back of the van were consistent with the carpet although he could not state a match with absolute scientific certainty because the carpet fabrics were commonplace.
On the afternoon of March 17, while returning from Hauppauge with the van found at the defendant's mother's house, Detective Bender received a message from headquarters that an arrest warrant had been issued for defendant and that defendant had contacted his uncle in Connecticut. The following day Bender and Investigator Thomas Hayes of the Ocean County Prosecutor's Office traveled to Wilton, Connecticut to interview Bernard Mancuso and his wife, Nancy.
Although the Mancusos said they saw defendant at family gatherings, they were not particularly close. So it was a surprise when on Friday, March 17, at about 1:30 p.m., defendant called. Nancy answered, and defendant asked for his uncle. After Nancy said that Bernard was not at home, defendant asked her if she could pick him up at the South Norwalk train station because he was "in deep trouble." Nancy asked what had happened and he told her that he would tell her later. Nancy told him to take the train to Wilton, where she picked him up. He had two duffel bags with him.
Defendant told Nancy in the car on the way to her home that he had dropped off his girlfriend in Brooklyn, that no one had seen her since and that the police were looking for him. Nancy told him that if he did not do anything, there was nothing to worry about. Defendant then told her that the girl's father was in the Mafia and that he and his men were coming to get him. He said he had been on the run in Pennsylvania and Chicago. Still in the car, defendant received a message on his pager and went to use a pay phone while Nancy went into a supermarket. When she returned, defendant told her that his mother told him that the police had impounded the white van belonging to his employer.
When Nancy got home, she spoke to Bernard privately, told him what defendant had told her and that she thought he was lying. Then all three went into the kitchen where defendant gave Bernard the same story he told Nancy. When Bernard started questioning defendant, he denied having hurt his girlfriend, and then, uncomfortable with Nancy present, asked to go into another room.
*514 Alone in the living room with Bernard, defendant told him that he had had a fight with his girlfriend and hit her in the head six or seven times with a crowbar. When Bernard asked if she was dead, defendant told him that he was sure that she was because he "went back and slit her throat." Defendant told him that it had happened in his apartment in New Jersey and that he cleaned up well but "messed up" by leaving his blood-stained shirt at the apartment.
Bernard told his nephew to turn himself in, but defendant said he was running and planned to take a bus to Los Angeles and work his way to Mexico using a fake birth certificate and driver's license. Bernard told him that fingerprints would convict him but defendant said he had wrapped Nicole's body in six or seven garbage bags, put her in a van, drove her to Long Island and put her in a dumpster. He refused to tell Bernard the location of the dumpster where he put the body.
Bernard was mortified and afraid for himself, his wife and his daughter. When defendant asked him for money, he gave him the $200 he had in his wallet to get him out of the house. He then drove defendant back to the train station. As he left, defendant said, "I hope you're not going to give me up." When he got home, Bernard had Nancy contact a lawyer friend, who put them in touch with a DEA agent who, in turn, spoke with the Mancusos and alerted the police in New Jersey.
About a week later defendant called his sister, Danielle. He had last seen her on Tuesday, March 13, when he showed up at her school. She was with him when he stole a Cadillac from a dealership by pretending to test drive it and then changed the license plates. He also had her withdraw $180 from her bank account to give to him. He would only tell her that something had happened to his girlfriend. When he called her, she told him that the police were looking for him, that the story was in the papers and that he should come back.
On March 27, 1995, defendant called the Mancuso home. Nancy answered and told him to call back when Bernard was home. She immediately contacted the FBI. When defendant called again, he spoke to Bernard, told him he was in Los Angeles and asked him for money so that he could come home and straighten things out. Bernard refused to transfer money but said he would arrange for a plane ticket waiting for him at the Los Angeles airport. Defendant told him to use the name "Morris" to match his fake identification. Defendant was arrested at the Los Angeles airport when he attempted to pick up his ticket.
Detective Hayes transported the defendant back to New Jersey. During the trip, defendant said, "I'm going to be forty-nine years old when I get out of jail for this." Hayes told him to keep quiet, but defendant asked if there was a chance that a person convicted of murder would do less than thirty years in New Jersey.
When he was returned to New Jersey, defendant was housed in the Ocean County Jail to await trial, and he became acquainted with Thomas MacPhee. Mac-Phee testified that defendant asked him if he knew anyone in the streets to kill his uncle for him because he felt that if the uncle testified against him, he would get thirty years in jail. MacPhee questioned why defendant would kill his uncle if he was innocent of killing Nicole. Defendant then admitted to MacPhee that he had killed her and that he was mad at her because she made him kill her. He said that on the night she was killed he was pacing his room and saying, "Stupid bitch, ain't like she never fucked before."
According to MacPhee defendant said he wanted his uncle tortured. When Mac-Phee said cutting him up could be messy, defendant said it would not be a mess as he had cut up Nicole and put her in trash bags and buried her so that the body could never be found.
*515 When MacPhee told defendant that he did not know anyone who would do the job, defendant asked MacPhee to do it when he got out of jail and promised him $5,000. Defendant showed MacPhee his bank statement which had about a $25,000 balance. MacPhee pretended to go along with the plan. He said defendant gave him detailed descriptions of Bernard and Nancy Mancuso, directions to their home, descriptions of their cars and license plate numbers, as well as an explanation of Bernard's daily routine at the train station and the address and directions to their summer home. He gave details about the house, such as the invisible fence, the dogs and the bird.
MacPhee said the defendant told him that he wanted a bomb planted under Bernard's car while it was parked at the train station and, if that could not be accomplished, then MacPhee should shoot Bernard. He suggested hanging around outside of the house in the bushes and waiting until Bernard got home from work and shoot him in the driveway. Alternatively, he said MacPhee should kill Nancy or Bernard's daughter, Jessica, in order to scare Bernard out of testifying. MacPhee claimed defendant said that he did not care if MacPhee blew up the whole house, including Nancy and Jessica, and that he planned to kill other people involved in the case after he was released from jail.
On September 4, 1995, MacPhee wrote a letter to the prosecutor detailing what defendant had suggested to him. Detective Hayes of the Ocean County Prosecutor's Office interviewed MacPhee, and MacPhee gave Hayes the notes he had taken from his talks with defendant. MacPhee agreed to wear a concealed tape recorder and engage defendant in another conversation regarding the plan. It was agreed that in exchange for wearing the recorder that MacPhee was to be moved to another jail for his safety.
On September 15, MacPhee wore the recorder and engaged defendant in a conversation which was later transcribed and played for the jury at defendant's trial. In addition to what defendant told MacPhee before about the killings, defendant discussed getting in touch with MacPhee after the fact to pay him. Six days later, MacPhee was released on his own recognizance, and the prosecutor subsequently recommended to the judge that the consecutive sentences MacPhee was serving for burglary and theft be changed to concurrent sentences after his trial testimony.
In the meantime, efforts continued to locate Nicole's remains. Detectives searched dumpsters in the area near defendant's mother's apartment as well as the incineration plant and the nearby landfill. No evidence was found of Nicole's remains, nor any indication of the titanium bar that was in her spine because of scoliosis.
Testifying for the State, Lisa Forman, an expert in DNA analysis, population genetics, human genetics and statistical analysis, analyzed four items taken from the crime scene which all contained blood: a pink shirt, a white shirt, the Mickey Mouse backpack and door molding. She excluded defendant as the source of the blood but concluded that Mr. and Mrs. Russo could not be eliminated as the biological parents of the person whose blood was on the items listed. While she could not say with certainty that the blood found in the apartment was the blood of the Russo's child, Nicole, Forman opined that the likelihood of a random person matching the set of characteristics found was one in 3.2 million.
William Shields, qualified as an expert in population genetics and statistics with regard to DNA, testified on behalf of defendant. He reviewed the DNA reports prepared by Forman and testified that Forman's report concerning the statistical likelihood that the DNA found in defendant's apartment was randomly matched to society was one in 3.2 million was not useful because the probability of a match was only meaningful when it could be *516 matched with a known individual, namely Nicole in this instance. However, Shields did agree that the blood found in the apartment was consistent with a child of Mr. and Mrs. Russo and that only one in every 1,600 pairs of individuals could be considered potential parents.
Other witnesses who testified on defendant's behalf included Michael Arsenault and Edward Higgins, inmates in the Ocean County Jail at the same time as MacPhee, who indicated that the doors to the inmates' cells were open and that if the inmates learned that MacPhee was a snitch, he would get on the list to get "beat down." Beth Hansen, wife of motel owner William Hansen, said that when defendant moved in, he told her that he wanted to change the carpet because it was in bad condition. Nicole's girlfriend, Prarie Rugilo, testified that she knew Nicole to stay away from home for a night at a time but added she would always come back the next day. She knew of nothing wrong in Nicole's relationship with her parents. Stacy Crowl, another girlfriend, testified that Nicole did not always get along with her parents, but she also knew of no major problems between them. Neither girl had had any contact with Nicole since she disappeared.
Defendant did not testify. He based his defense on the theory that Nicole was a troubled runaway who had absconded and remained away.
On appeal, defendant sets forth the following arguments of judicial error by the trial judge:

POINT ITHE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNTS TWO, THREE AND FOUR OF THE INDICTMENT.
A. WITH RESPECT TO THE ATTEMPTED MURDER CHARGES ON COUNTS THREE AND FOUR THE EVIDENCE IN THE STATE'S CASE WAS SO SCANT THAT NO REASONABLE JURY COULD HAVE CONVICTED HIM.
B. WITH RESPECT TO THE CONSPIRACY CHARGE IN COUNT TWO AT MOST THE DEFENDANT ONLY HAD A CRIMINAL STATE OF MIND BUT WAS NOT PART OF ANY AGREEMENT TO KILL HIS UNCLE OR ANY MEMBERS OF HIS UNCLE'S IMMEDIATE FAMILY.

POINT IIDETECTIVE BENDER'S WARRANTLESS ENTRY INTO THE DEFENDANT'S APARTMENT ON MARCH 15, 1995 WAS ILLEGAL AND ALL SUBSEQUENT POLICE SEARCHES AND SEIZURES WERE TAINTED AS THE FRUIT OF UNLAWFUL POLICE CONDUCT.
A. THE "SPECIAL NEEDS" EXCEPTION TO THE FOURTH AMENDMENT WAS INAPPROPRIATELY APPLIED TO THE CASE.
B. THE COURT ERRED IN DETERMINING THAT DEFENDANT HAD ABANDONED HIS PRIVACY RIGHTS TO HIS APARTMENT.

POINT IIIEVIDENCE THAT THE DEFENDANT STOLE A USED CAR WAS IMPROPERLY ADMITTED AS OTHER CRIMES EVIDENCE BECAUSE THE ACT OF THEFT WAS IRRELEVANT TO THE ISSUE OF FLIGHT AND WAS SO UNDULY PREJUDICIAL THAT IT SHOULD HAVE BEEN EXCLUDED PURSUANT OF N.J.R.E. 403.

POINT IV THE COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO SEVER COUNTS TWO, THREE AND FOUR BECAUSE THE PREJUDICE OF THE JOINDER OUTWEIGHED THE INTERESTS OF JUDICIAL ECONOMY.

POINT V THE COURT ABUSED ITS DISCRETION IN ALLOWING DR. FORMAN TO TESTIFY THAT THE "DONOR'S" DNA WAS CONSISTENT WITH THE DNA OF MR. AND MRS. RUSSO.

*517 POINT VIIMPOSITION OF AN AGGREGATE SENTENCE OF LIFE PLUS TWENTY (20) YEARS WITH A PAROLE INELIGIBILITY PERIOD OF FORTY (40) YEARS WAS MANIFESTLY EXCESSIVE AND AN ABUSE OF THE COURT'S DISCRETION.
A. THE COURT ABUSED ITS DISCRETION IN FINDING THAT AGGRAVATING FACTOR N.J.S.A. 2C:44-1(A)(2) WAS PRESENT.
B. RUNNING THE SENTENCE IMPOSED ON COUNT THREE CONSECUTIVE TO COUNT ONE WAS MANIFESTLY EXCESSIVE AND AN ABUSE OF DISCRETION.
C. THE COURT FAILED TO SET FORTH ITS REASONS FOR IMPOSING THE TEN (10) YEAR PERIOD OF PAROLE INELIGIBILITY ON COUNT THREE.
Defendant argues initially that the trial judge erred in denying his motion for acquittal at the end of the State's case as to counts two and three, the charges of attempted murder and conspiracy to murder his uncle and his family. He contends that the State failed to show the substantial step necessary for attempted murder and failed to prove the agreement required for conspiracy. We disagree.
In viewing the evidence presented at the conclusion of the State's case, Judge Turnbach properly gave the State the benefit of all proper inferences which could reasonably be drawn from the State's proofs. State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). More than sufficient evidence was presented to the jury to show that defendant took substantial steps to accomplish his plan.
Defendant expected MacPhee to be released from jail in the near future. He showed MacPhee his bank statement to prove that he could pay him $5,000 to perform the killings. When MacPhee agreed, defendant provided him with details concerning the intended victims, including the home address and summer home address, phone numbers, cars and license plate numbers, physical descriptions, description of the house and Bernard Mancuso's daily routine. They discussed how the plan was to be carried out. Defendant suggested that MacPhee plant a bomb under Bernard's car while it was at the train station, plant a bomb in the house or simply shoot Bernard on his return from work. Defendant also spoke about how MacPhee was to get in touch with him after the crime and how MacPhee would get paid. A jury could reasonably conclude that by enlisting MacPhee to his evil plan and providing information to assist facilitating its purpose that defendant took substantial steps to further the crime. See State v. Fornino, 223 N.J.Super. 531, 539 A.2d 301 (App.Div.), certif. denied, 111 N.J. 570, 546 A.2d 499, cert. denied, 488 U.S. 859, 109 S.Ct. 152, 102 L.Ed. 2d 123 (1988).
Similarly, defendant's argument that there was insufficient proof for jury consideration of the conspiracy charge ignores both the testimony and the favorable permissible inferences from the evidence. Reyes, supra, 50 N.J. at 458-59, 236 A.2d 385. MacPhee agreed to kill Bernard Mancuso and his family and continued to plan the murder with defendant, who gave him specific information to aid in the commission of the crime and promised payment of $5,000 when the crimes were committed. The fact that MacPhee knew that he would not carry out the murders is not a valid defense to the charge of conspiracy. State v. Conway, 193 N.J.Super. 133, 159-60, 472 A.2d 588 (App.Div.), certif. denied, 97 N.J. 650, 483 A.2d 174 (1984).
Defendant next argues that Detective Bender's entry into his Parkside Motel apartment on March 15, 1995, was illegal because no search warrant was obtained and that, therefore, the results of the search and all subsequent seizures were tainted as the fruit of unlawful police conduct. The State maintains that the warrantless entry was reasonable in order to *518 locate a sixteen year old runaway girl. Alternately, the State also contends in accordance with the determination of Judge Turnbach that even if the initial search was unreasonable, the fruits of that search and subsequent searches would inevitably have been discovered through an independent source.
The inevitable discovery rule was initially set forth by the United States Supreme Court in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and was adopted by our Court in State v. Sugar (Sugar II), 100 N.J. 214, 238-39, 495 A.2d 90 (1985). The rule provides that "[e]vidence is admissible even though it was the product of an illegal search, "when... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, [for] there is no nexus sufficient to provide a taint.'" State v. Sugar (Sugar III), 108 N.J. 151, 156, 527 A.2d 1377 (1987) (quoting Nix, supra, 467 U.S. at 448, 104 S.Ct. at 2511, 81 L.Ed.2d at 390).
In order to invoke the inevitable discovery rule, the State has to prove by clear and convincing evidence that:
(1) [p]roper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
[State v. Sugar (Sugar II), supra, 100 N.J. at 238, 495 A.2d 90.]
There can be no doubt that proper, normal and specific investigatory procedures would have been pursued in order to locate Nicole, who was at first considered a missing person. The pursuit of these procedures led to Bender's conversation with Romaniello, which raised significant questions concerning defendant, since defendant had told Bender that he had been in Brooklyn at 9:30 p.m. on Sunday night but Romaniello placed him at the apartment. Moreover, earlier in the evening Romaniello had seen defendant change his clothes and stand outside in cold weather dressed only in jeans, and make a pay phone call even though there was a telephone in his room. Romaniello also heard a thump against the wall and saw defendant leave in a white van with a rolled up carpet. Finally, the day after the warrantless search, Bender learned that defendant had confessed to his uncle to murdering Nicole in his motel room in New Jersey. All of these events would have formed the supportable basis for a warrant.
Alternatively, Hansen, the motel owner, would have eventually entered the room abandoned by defendant, who had told his uncle that he was fleeing with no intention of returning to New Jersey. Considering the police activity, the attendant publicity and the concerns of Nicole's father, it is certain that Hansen would have turned over all of Nicole's items and permitted entry and search by the police.
We hold that the State established by clear and convincing evidence as found by the trial judge, see State v. Johnson, 120 N.J. 263, 289, 576 A.2d 834 (1990), that all of the evidence uncovered in the initial, warrantless search would eventually and inevitably have been found independent of the search and that the motion to suppress evidence seized as a result of the initial entry as well as all subsequent searches was properly denied.
There is no merit in defendant's contention of error by the trial judge in permitting testimony by defendant's sister, Danielle, that defendant stole a car in order to leave the area. The evidence was relevant to defendant's consciousness of guilt relating to an intent to flee and avoid detection and apprehension. See State v. Sullivan, 43 N.J. 209, 239, 203 A.2d 177 (1964), cert. denied, 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966). *519 Judge Turnbach took special pains to insure the proper use of the testimony by promptly instructing the jury after Danielle testified that:
You may or may not find that he stole a car. If you find that he stole a car, you may not conclude from that that he's a bad person and therefore would have committed the other crimes involved in this particular case. In other words, evidence that, should you find, someone committed an offense on one occasion does not prove that he committed an offense on the other occasion.
However, I have allowed this evidence in for a limited purpose. The prosecutor, at the end of the case, is going to be arguing, and the Court will be instructing you on, the doctrine of flight ...
The only purpose that this evidence here is admitted, and for which you may consider it, is with regard to the issue of whether or not the defendant took flight.
In his final jury instructions, Judge Turnbach referred to the stolen car evidence and then charged:
Evidence that a defendant committed a crime other than the one for which he stands trial is admitted for a specific and limited purpose. You may not consider it as evidence establishing that a defendant is disposed to committing criminal acts and infer therefrom that he committed the offense for which he is on trial. You may not infer therefrom that the defendant is a bad person and, therefore, probably committed the offense for which he stands trial.
The sole purpose for which you may consider this evidence is with regard to the issue of flight.
N.J.R.E. 404(b) states the following:
Evidence of other crimes, wrongs or acts is not admissible to provide the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
The rule guards a defendant's right to a fair trial by avoiding the danger that a jury might convict the accused simply because the jurors perceived him to be a bad person. State v. Ramseur, 106 N.J. 123, 265, 524 A.2d 188 (1987). With respect to the admission of "other crimes" evidence, a trial judge must analyze four factors:
(1) The evidence of the other crime must be admissible as relevant to a material issue;
(2) It must be similar in kind and reasonably close in time to the offense charged;
(3) The evidence of the other crime must be clear and convincing; and
(4) The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992).]
Defendant does not contest either the probative value of the testimony or that the evidence of his theft of the Cadillac was clear and convincing. Rather he claims that whether or not the car he secured in order to flee was stolen was irrelevant to the issue of flight and that the admission of the testimony was therefore prejudicial. We disagree.
While flight could have been proved without evidence defendant stole a car, the fact that he used a stolen car to flee relates to an intent to avoid detection and apprehension. Defendant took the car in Long Island rather than return to New Jersey where he had free access to automobiles as a result of his employment at The Auto Shop. He therefore stole a vehicle that could not be traced to him and then installed other license plates in a further effort to avoid detection. We hold that the evidence was properly received and that the jury was appropriately instructed as to its use.
*520 We also find no error in the denial of defendant's motion to sever count one of the indictment, charging the murder of Nicole Russo, from the other counts of attempted murder and conspiracy with MacPhee to murder the Mancusos. Whether a severance should be granted is a matter of the discretion of the trial judge, and we defer to that decision absent an abuse of discretion. State v. Chenique-Puey, 145 N.J. 334, 341, 678 A.2d 694 (1996); State v. Mance, 300 N.J.Super. 37, 53, 691 A.2d 1369 (App.Div.1997).
Similar or related offenses may be joined for a single trial as long as the defendant's right to a fair trial is not prejudiced. See State v. Coleman, 46 N.J. 16, 24, 214 A.2d 393 (1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1210,16 L.Ed.2d 212 (1966). The test is whether the jury could arrive at a decision on each charge separately and irrespective of the evidence concerning guilt on the other charges. State v. Hines, 109 N.J.Super. 298, 306, 263 A.2d 161 (App.Div.), certif. denied, 56 N.J. 248, 265 A.2d 703, cert. denied, 400 U.S. 867, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970).
Central to deciding whether joinder is prejudicial is " Whether, assuming the charges were tried separately, evidence of the offense sought to be severed would be admissible under Evidence Rule 55 [now N.J.R.E. 404(b)] in the trial of the remaining charges.'" State v. Oliver, 133 N.J. 141, 151, 627 A.2d 144 (1993) (quoting State v. Pitts, 116 N.J. 580, 601-02, 562 A.2d 1320 (1989)). If the evidence would be admissible at both trials, then the trial court may consolidate the charges because "a defendant will not suffer any more prejudice in a joint trial than he would in separate trials." State v. Coruzzi, 189 N.J.Super. 273, 299, 460 A.2d 120 (App. Div.), certif. denied, 94 N.J. 531, 468 A.2d 185 (1983).
While there was a time span of approximately six months from Nicole's murder to the alleged crimes against the Mancusos, evidence of each of the crimes is so interrelated as to be admissible at separate trials. The proofs showed that defendant confessed killing Nicole to his uncle and that his uncle was scheduled to testify against defendant on that charge. A plan by defendant to kill his uncle or his family in order to prevent him from testifying would obviously be relevant as to motive on the charges of attempted murder and conspiracy to murder the Mancusos. See N.J.R.E. 404(b). Moreover, the attempt and plot to kill the witness or his family would also be admissible on the charge of murdering Nicole since it would illuminate defendant's consciousness of guilt. See State v. Buhl, 269 N.J.Super. 344, 364, 635 A.2d 562 (App.Div.), certif denied, 135 N.J. 468, 640 A.2d 850 (1994). In the absence of undue prejudice and with recognition of judicial economy, we find no abuse of discretion in denying the motion to sever the counts of the indictment.
Defendant's remaining arguments in his brief and in his pro se supplemental brief are without merit and do not warrant further discussion in this opinion. We note only that Judge Turnbach properly considered State v. Yarbough, 100 N.J. 627, 630, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986) in the imposition of consecutive sentences and made appropriate findings as to aggravating factors and assigning proper weight to justify the imposition of a ten year parole disqualifier on the charge of attempted murder. The sentencing judge acted within his discretion in setting the sentence, which does not shock our judicial conscience.
Affirmed.