SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Quashawn K. Jones (A-64-18) (081862)**

**Argued January 6, 2020 -- Decided May 13, 2020**

**TIMPONE, J., writing for the Court.**

In this appeal, the Court considers defendant Quashawn K. Jones's conviction for first-degree attempted murder of the victim A.A., in an effort to keep her from testifying against him. The evidence against defendant came largely from recorded and preserved conversations between defendant and others while he was incarcerated, during which defendant railed about A.A., insisting that she be prevented from testifying against him. His rantings ranged from anger that she had not already been killed to having bail posted for him so that he could do it himself. The Appellate Division reversed the attempted murder charge that was based on the recorded phone calls, finding insufficient evidence to prove the "substantial step" element of attempt.

In November 2013, A.A. and a friend were at the apartment of another friend, along with defendant. Defendant became agitated and accused the women present, including A.A., of setting him up to be robbed or killed. He pulled out a gun and, as those present attempted to flee, shot A.A. multiple times. Defendant was arrested and indicted on ten counts, including two counts of first-degree murder.

At trial, the State offered that, during his pre-trial incarceration, defendant began calling cohorts to enlist them in killing A.A. after learning she intended to testify against him. To support the second attempted murder charge, the State introduced, and the jury heard, recorded phone calls defendant made to his girlfriend and cousin from the Atlantic County jail. Although defendant was given his own inmate PIN number with which to make phone calls, he used a host of other inmates' PIN numbers to conceal his identity and involvement in the calls. The State played several excerpts of the calls.

In one call on February 18, 2014, defendant expressed surprise and anger that A.A. was present in court with her brother and provided a statement against him. During the same conversation, defendant demanded that his girlfriend and cousin post his bail immediately. He also demanded his girlfriend contact an individual named "KG" to inquire about why A.A. was still alive and appearing in court. The next excerpt played was from February 21, 2014. Defendant again demanded action from "KG." A phone call recorded on February 25, 2014 reveals defendant's frustration that no action had been

1

taken against A.A. Once again, defendant demands his cousin post his bail immediately because he wants to take care of A.A. himself. The jury heard another excerpt from a phone call recorded on March 13, 2014 in which defendant once again demanded his girlfriend and cousin post his bail so that he could "handle" A.A. himself.

Defendant moved for a judgment of acquittal with respect to the attempted murder charge premised on the recorded statements. The trial court denied the motion, finding the jury could conclude that defendant took a substantial step to kill A.A. The jury found defendant guilty on all charges but one, as to which it found a lesser-degree offense.

The Appellate Division affirmed in part but reversed on the challenged attempted murder charge, concluding that "defendant's [telephone] conversations fall short of the substantial step required for attempt under N.J.S.A. 2C:5-1(a)(3)."

The Court granted the State's petition for certification. 237 N.J. 312 (2019).

**HELD:** Although the facts lie at the outer edges of what is sufficient to show a substantial step based on verbal acts, when defendant's statements on the recorded conversations are considered in the context of this case, the State presented sufficient evidence for the jury to find a substantial step for attempted murder.

1. A person is guilty of criminal attempt if the person acts with the requisite culpability and "[p]urposely does . . . anything which, under the circumstances as a reasonable person would believe them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1. To prove a substantial step, the State must show "conduct by an accused that strongly corroborates his . . . alleged criminal purpose." State v. Perez, 177 N.J. 540, 553 (2003). The conduct is not considered in isolation; rather, courts "consider [a] defendant's words and acts in tandem as part of the whole picture." Id. at 554. (pp. 16-17)

2. Case law reveals that attempts at persuasion can constitute conduct for purposes of attempt in appropriate circumstances. In Perez, the Court evaluated the sufficiency of the State's evidence regarding a conviction for child endangerment based upon attempts to verbally lure a child victim into a car. 177 N.J. at 544. The defendant was arrested after offering a thirteen-year-old a ride and asking her to approach him. Id. at 544-45. Upon arrest, the defendant admitted that he found the girl attractive and stated, "I am obsessed with her, but not like anything out of the ordinary." Id. at 545. The Court found that, "consider[ing the] defendant's words and acts in tandem," jurors may have inferred from his admissions an intent to commit the prohibited act, and that his actions constituted a substantial step toward that act. Id. at 554. Other New Jersey courts have applied a similar words-and-context analysis in holding that conversations aimed at persuading others to commit criminal activities can, under certain circumstances, rise to the level of an attempt to commit those activities. The Court reviews three such cases. (pp. 17-23)

2

3. In considering the present case, the Court notes the trial court's observation that rarely do you have a victim who survives a shooting come into court to give direct, compelling, and definitive testimony about the horrors she was subjected to by a defendant. It is even rarer to have, in the same case, intercepted phone conversations from a county prison in which a defendant basically admits his guilt in his own words. Considering the rare circumstances in this case, the Court finds that defendant took an intentional substantial step in planning the murder of A.A. during his incarceration when he expressly directed his girlfriend and cousin to contact people to kill A.A., as well as demanding that they post his bail so that he could kill A.A. himself. The Court reviews the details of certain conversations and observes that defendant's use of other inmates' assigned PIN numbers to make these phone calls from prison is pertinent. It demonstrates his attempt at covering up his efforts to make A.A. unavailable to testify against him. Given that backdrop, defendant's conversations with his girlfriend and cousin were much more than just meaningless vents of frustration "wishing" for A.A.'s demise. Defendant's insistent verbal demands in the context of these circumstances corroborated the firmness of his purpose to have the crime carried out and are sufficient to satisfy the substantial step requirement for criminal attempt pursuant to N.J.S.A. 2C:5-1(a). (pp. 24-27)

4. As the Court found in Perez, the standard for a substantial step is clear and requires only that the accused's conduct strongly corroborate his or her alleged criminal purpose. 177 N.J. at 553. The Court recognizes that this lies at the outer edges of proofs to support a substantial step for an attempt charge because it relies on the context and import of defendant's verbal acts. But the Appellate Division's requirement in this case that the State produce verbal or physical actions beyond the actual solicitations raises the level of proof required to establish a substantial step for criminal intent. Context is important for finding the verbal acts sufficient enough in this matter. Defendant's decrees here -- 1) instructing his girlfriend to text someone on his behalf to carry out the murder of A.A., 2) directing his cohorts to carry out the murder of A.A., and 3) demanding that his cousin post bail to briefly release him from jail so that he could carry out the murder himself -- were designed to prompt actions that could not be undertaken by defendant himself due to his incarceration. The State presented sufficient evidence for the jury to conclude that defendant took substantial steps to accomplish his plan. Id. at 554-55. Defendant's actions permitted the jury to draw reasonable inferences and conclude that defendant's actions throughout his telephone calls, and how accomplished, together provided the necessary "substantial step" for attempted murder. (pp. 27-31)

**The judgment of the Appellate Division is REVERSED and defendant's conviction and sentence are REINSTATED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.**

SUPREME COURT OF NEW JERSEY
A-64 September Term 2018
081862

State of New Jersey,

Plaintiff-Appellant,

v.

Quashawn K. Jones,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| January 6, 2020 | May 13, 2020 |

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for appellant (Damon G. Tyner, Atlantic County Prosecutor, attorney; Melinda A. Harrigan, on the briefs).

Rochelle Watson, Deputy Public Defender, argued the cause for respondent (Joseph Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the briefs).

Evgeniya Sitnikova, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Evgeniya Sitnikova, of counsel and on the brief).

Oleg Nekritin submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (Law Offices of Robert J. De Groot, attorneys).

JUSTICE TIMPONE delivered the opinion of the Court.

In this appeal we address defendant Quashawn K. Jones's conviction for first-degree attempted murder of the victim A.A., in an effort to keep her from testifying against him. The evidence against defendant came largely from recorded and preserved conversations between defendant and others while he was incarcerated.

The backdrop for defendant's second charge of attempted murder comes on the heels of defendant shooting the victim three times. A.A. survived and came forward as a witness against defendant.

From jail, in conversation after conversation with his cohorts, defendant railed about A.A., insisting that she be prevented from testifying against him. His rantings ranged from anger that she had not already been killed as he so very much wanted and expected to having bail posted for him so that he could do it himself.

The Appellate Division reversed the attempted murder charge that was based on the recorded phone calls, finding insufficient evidence to prove the "substantial step" element of attempt. The Appellate Division held that,

2

"[w]ithout evidence of an act by defendant identifying a perpetrator and orchestrating the requisite course of conduct to culminate in the commission of the crime, the State's proofs fall short."

We now reverse the Appellate Division and reinstate defendant's conviction and sentence for the first-degree attempted murder charge relevant to this appeal. Although the facts lie at the outer edges of what is sufficient to show a substantial step based on verbal acts, when defendant's statements on the recorded conversations are considered in the context of this case, we conclude that the State presented sufficient evidence for the jury to find a substantial step for attempted murder.

I.

A.

We derive our summary of facts from the record.

During the early morning hours of November 18, 2013, A.A. and her two long-time friends, M.C. and U.J., were together at M.C.'s apartment in Atlantic City with defendant. A.A. observed defendant "[p]acing back and forth" in the kitchen and watching out the window. U.J. was also in the kitchen looking out the window. According to A.A., defendant was sweating profusely, appeared angry and agitated, and asked U.J. why she was looking out the window. U.J. responded that she was waiting for her boyfriend to

3

arrive, but that did not seem to appease defendant. Defendant repeatedly asked A.A. why she kept looking at him. Shortly thereafter, defendant accused the women of setting defendant up to be robbed or killed, and defendant told M.C. that he was going to kill A.A.

When defendant pulled a gun out of his waistband, A.A. knew that he was serious and fled to the bathroom, intending to escape through the bathroom window. Fearing she would do harm to herself by jumping out of the second-floor window, A.A. decided to try to assuage defendant's fears by showing him her phone -- to prove that she had not contacted anyone to set him up. After A.A. came out of the bathroom to show defendant her phone, a struggle ensued between A.A. and defendant in the kitchen. M.C. tried to restrain defendant, but the altercation escalated and all three ended up on the floor. As the struggle continued, U.J. and M.C. managed to flee, leaving A.A. alone fighting defendant.

During the struggle, A.A. heard a gunshot but was unsure at the time whether the gun had discharged on its own or whether defendant had shot her. After defendant managed to separate himself from A.A., he placed his foot on her chest and shot her in the neck. A.A. remained conscious but pretended to be dead, thinking it would end the entire ordeal. While A.A. played possum, she observed defendant open the kitchen window, fire a shot out the window

4

and yell, "help, I'm hit, I'm hit." At that point, M.C., who was in another room, yelled out to defendant that if he put the gun down she would return to the kitchen. Momentarily forgetting that she was pretending to be dead, A.A. yelled out to M.C. for help. Defendant responded to M.C. that, "[i]f you come in the kitchen, I'm going to kill this bitch." Defendant then shot A.A. a second time in the neck, fired a shot out the kitchen window a second time, and shot A.A. one more time in her body before jumping out of the kitchen window and fleeing the scene. A.A. suffered multiple gunshot wounds to her neck and face, her left arm, and her right armpit. She had a collapsed lung, a fractured clavicle, and a fractured humerus. A.A. was treated and survived. Defendant was apprehended shortly after the incident.

B.

Defendant was indicted by the Atlantic County Prosecutor's Office on ten counts, which included attempted murder, aggravated assault, possession of a weapon for an unlawful purpose, witness tampering, and certain persons not to have weapons. The counts relevant to this appeal are two counts of first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3a(1) and/or (2); and two counts of first-degree witness tampering, N.J.S.A. 2C:28-5(a). Before trial, the State dismissed one count of aggravated assault.

5

C.

On July 13, 2015, the jury trial commenced.  At trial, the State offered that, during his pre-trial incarceration, defendant began calling cohorts to enlist them in killing A.A. after learning she intended to testify against him. To support the second attempted murder charge, the State introduced, and the jury heard, recorded phone calls defendant made to his girlfriend and cousin from the Atlantic County jail between February 8, 2014 and April 28, 2014. Although defendant was given his own inmate PIN number with which to make phone calls, he used a host of other inmates' PIN numbers to conceal his identity and involvement in the calls.  The State played several excerpts of the calls.

In one call on February 18, 2014, defendant expressed surprise and anger that A.A. was present in court with her brother and provided a statement against him.

> [Defendant]:  No I was callin like what's up . . . yo what's up with [my cousin], y'all talk to that bail bondsman?  Ya'll gotta bust that thing ASAP.
>
> [Girlfriend]:  I don't know what's up with her I haven't talked to her you still ain't talk to her?
>
> [Defendant]:  Hell no I went to court today man that bitch was in court like what's goin on?
>
> [Girlfriend]:  Who, the girl was in court?

6

[Defendant]: Her and her brother.

[Girlfriend]: Her and her brother was in court?

[Defendant]: Man they threw my aggravated assault shit out they indictin me on attempted murder now.

[Girlfriend]: Oh my God[.]

During the same conversation, defendant demanded that his girlfriend and cousin post his bail immediately. He also demanded his girlfriend contact an individual named "KG" to inquire about why A.A. was still alive and appearing in court.

> [Defendant]: Man tell her she gotta call that bail bondsman, post my bail and shit now for they do some fuck shit like post my shit down. She gotta do that shit now . . . .
>
> . . . .
>
> [Defendant]: A yo call . . . did you call KG?
>
> [Girlfriend]: No I never called KG.
>
> [Defendant]: Yea man you got to call that [n-word] man . . . .
>
> [Girlfriend]: Well, what am I sayin to KG, you said ask him about that car.
>
> [Defendant]: Yeah ask him about the car and tell him what happened wit me in court like he shoulda spo . . .

7

he supposed to (inaudible) like what the fuck is people still walkin around for?

[Girlfriend]: Well, what is he . . . what am I supposed to tell him that the girl be in court?

[Defendant]: Yeah.

The next excerpt played was from February 21, 2014. Defendant again demanded action from "KG."

[Defendant]: Well, you just text him off of that and tell him I said man he gotta down that shit dog

[Girlfriend]: (Inaudible) my phone, I'm going to text him on the iPad (inaudible)

[Defendant]: This shit is just, he gotta down that, fuck that man them bitches is coming, she keep talking all this bitches ain't coming man fuck that . . . .

A phone call recorded on February 25, 2014 reveals defendant's frustration that no action had been taken against A.A. Once again, defendant demands his cousin post his bail immediately because he wants to take care of A.A. himself. The pertinent portion of that conversation is as follows:

[Defendant]: Man fuck, fuck what everybody else is looking at everybody else is not in my position everybody else is still out there fucking swinging while this bitch running around.

[Cousin]: (Inaudible)

[Defendant]: On the streets with your sister.

8

. . . .

[Defendant]: Ain't nobody, if [n-word]s was understanding my position that bitch would have been dead already if [n-word]s was understanding my position, fuck outta here ain't nobody understanding my position yo that bitch is still out there running round with your sister and she's coming to court but [n-word]s if understanding my position man come on man nobody understanding my fucking position dog that shit's crazy as hell yo . . . .

. . . .

[Cousin]: It ain't that what nobody got planned in their mind it's just nobody don't want to put money up and then you have to turn around and get picked back up and then you need money for a lawyer, either way you're gonna need a lawyer regardless

[Defendant]: Alright man it ain't no lawyer, I wouldn't need a lawyer if [n-word]s was moving and doing what they supposed to be doing the bitch should have been dead already.

[Cousin]: I can't do it for them I can't make them get I can't make them get busy you knew who you is dealing with I can't make them get out there and get busy I can't definitely get out there and do the type of shit that they can do (inaudible)

[Defendant]: Yeah I know but you can get me out of here so I can handle what I gotta handle that's my whole thing that's my whole thing I'm not worried about nobody else

9

. . . .

[Defendant]: Hey no it does not if I was out here for one day or one week . . . it does not matter my case will be better.

. . . .

[Defendant]: (Inaudible) but nobody but nobody's you gun go did the bitch who's gonna do something to the bitch cause she's still swinging

[Cousin]: Oh my god

[Defendant]: She's still swingin. Yo everybody knows where she's at but nothing's goin on, nothing's going on like this shit is this shit is crazy yo oh man aright yo aright this shit is crazy you got it that shit's ridiculous . . . .

. . . .

[Defendant]: Shit, like this shit is crazy like motherfuckers is out there somebody should of went and downt that bitch already . . . .

The jury heard another excerpt from a phone call recorded on March 13, 2014 in which defendant once again demanded his girlfriend and cousin post his bail so that he could "handle" A.A. himself.

[Defendant]: I said just like fuck a lawyer like it ain't no point in going in there with a lawyer and you got this bitch getting up there, what the fuck is a lawyer gonna do when she's getting up there, like what the fuck everybody just looking from the outside in oh he's taking this overboard he's bugging he's tripping, I am

10

bugging and tripping cause ain't nobody getting out their fucking bed to go knock this bitch off count or say anything to the bitch, none of that nobody's doing none of that everybody's just swinging still partying and bullshittin, but if it was them and they need the done shit would of got done, shit would have been done already like no if ands or buts about it.

. . . .

[Defendant]: [I]f ya'll not gonna handle the situation get me the fuck back out so I can handle the situation, the [n-word]s is just nervous and scared like the gun's gonna get turned on them which it might, like I have no problem with that, never did that's just me like fuck it but you know

A.A. testified at trial that during her visit with another inmate at the Atlantic County jail on September 2014, defendant took the phone from the other inmate and told A.A. she was the only way he could get out of jail and that she "needed to make this go away." A.A. also testified that a man approached her on the street, telling her that defendant needed her to recant her statement. In a separate incident, a woman told A.A. "not to come to court."

On July 20, 2015, following the State's case-in-chief, defendant moved for a judgment of acquittal with respect to the witness tampering charge and the second attempted murder charge, which were premised on the recorded statements. The trial court granted defendant's motion as to the witness tampering charge but denied it for the second attempted murder charge. The

11

trial court found the jury could draw a conclusion that defendant took a substantial step to kill A.A.

On July 21, 2015, the jury returned its verdict, finding defendant guilty on all charges except a first-degree witness tampering charge, returning instead a guilty verdict on the lesser offense of third-degree witness tampering. In a bifurcated bench trial, the judge found defendant guilty of the certain persons not to have weapons charge. The court sentenced defendant to an aggregate sixty-five-year term of imprisonment, of which fifty years would be subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

The Appellate Division affirmed in part but reversed on the second attempted murder charge. It concluded the motion for judgment of acquittal should have been granted at the end of the State's case because "defendant's [telephone] conversations fall short of the substantial step required for attempt under N.J.S.A. 2C:5-1(a)(3)."

We granted the State's petition for certification, 237 N.J. 312 (2019), and granted amicus curiae status to the Attorney General and to the Association of Criminal Defense Lawyers of New Jersey (ACDL).

II.

The State argues the Appellate Division erred in finding there was insufficient evidence to support the attempted murder charge. Citing to State

12

v. Reyes, 50 N.J. 454, 458-59 (1967), and Rule 3:18-1, the State contends the Appellate Division should have given it the benefit of all favorable testimony and inferences to determine whether a reasonable jury could have found guilt beyond a reasonable doubt. The State emphasizes that the proffered statements are more than just defendant's "wishes" that death befall A.A. Instead, the State maintains the defendant's statements constitute circumstantial evidence that defendant took a substantial step toward having A.A. killed.

The Attorney General likewise argues that an appellate court must respect the role of the jury in evaluating evidence and that the evidence should be viewed in the light most favorable to the State. The Attorney General argues that State v. Perez, 177 N.J. 540 (2003), is directly on point, and urges the court to "consider defendant's words and acts in tandem as part of the whole picture from which the jury could have drawn its inferences." (quoting Perez, 177 N.J. at 554). In the Attorney General's view, the recorded conversations were sufficient to permit the jury to infer that it was more probable than not that defendant made demands on his cohorts.

Defendant argues these recorded phone calls cannot establish a substantial step toward murder because no one was solicited to commit a crime, no plan was devised, and no course of action was set in motion. He

13

posits the Appellate Division's decision should be affirmed because it properly applied the body of law regarding criminal attempt, which requires acts beyond mere solicitation. Defendant argues that since the adoption of the criminal code, our courts have interpreted solicitation, in the context of attempt, to require both the solicitation and acts in furtherance of the criminal purpose. Defendant asserts the Appellate Division properly found that defendant's words fell short of proving a substantial step. Defendant argues that unlike Perez, where the defendant's words were used to give meaning to his actions, here, the State is using his words to establish that the criminal act itself took place at some point in the past.

The ACDL similarly argues that mere wishes and frustrations are insufficient to demonstrate that defendant took a substantial step to cause A.A.'s death. Quoting from State v. Belliard, 415 N.J. Super. 51, 73 (App. Div. 2010), the ACDL asserts such a step "must be substantial and not just a very remote preparatory act, and must show that the accused has a firmness of criminal purpose." The ACDL contends that defendant's statements in the recorded phone calls cannot constitute a substantial step toward murder because none of those statements suggest there was any command, quid pro quo, or payment directing A.A.'s murder.

III.

A judgment of acquittal shall be entered "[a]t the close of the State's case . . . if the evidence is insufficient to warrant a conviction." R. 3:18-1. "In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review." State v. Williams, 218 N.J. 576, 593-94 (2014). We view "the State's evidence in its entirety, be that evidence direct or circumstantial." See Reyes, 50 N.J. at 459.

In considering circumstantial evidence, we follow an approach "of logic and common sense. When each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole, judgment of acquittal is not warranted." State v. Samuels, 189 N.J. 236, 246 (2007) (alterations in original) (internal citations and quotations omitted). And our review is guided by the following principles:

> When evaluating motions to acquit based on insufficient evidence, courts must view the totality of evidence, be it direct or circumstantial, in a light most favorable to the State. More specifically, we must give the government in this setting "the benefit of all its favorable testimony as well as of the favorable inferences [that] reasonably could be drawn therefrom[.]" Within that framework, the applicable standard is whether such evidence would enable a reasonable jury to find that the accused is guilty beyond a reasonable doubt of the crime or crimes charged.

15

[Perez, 177 N.J. at 549-50 (alterations in original) (emphases added) (quoting Reyes, 50 N.J. at 459).]

We apply those principles to the attempted murder charge at issue here, which is based largely on the telephone conversations excerpted above.

## IV.

## A.

A person is guilty of criminal attempt "if, acting with the kind of culpability otherwise required for the commission of the crime," the person "[p]urposely does . . . anything which, under the circumstances as a reasonable person would believe them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1. The State is tasked with proving both a criminal purpose and a substantial step toward the commission of the crime. See Perez, 177 N.J. at 553.

The criminal purpose element focuses "on the intent of the actor to cause a criminal result rather than on the resulting harm." State v. Robinson, 136 N.J. 476, 483 (1994) (citation omitted). "An attempt is purposeful 'not only because it is so defined by statute, but because one cannot logically attempt to cause a particular result unless causing that result is one's "conscious object," the distinguishing feature of a purposeful mental state.'" State v. McCoy, 116

16

N.J. 293, 304 (1989) (quoting State v. McAllister, 211 N.J. Super. 355, 362 (App. Div. 1986)).

The State must also prove that the actor has taken a "substantial step" toward the commission of the crime. See N.J.S.A. 2C:5-1(a)(3). That is, the State must show "conduct by an accused that strongly corroborates his . . . alleged criminal purpose." Perez, 177 N.J. at 553; see also N.J.S.A. 2C:5-1(b) ("Conduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose."). And the conduct is not considered in isolation; rather, "we consider [a] defendant's words and acts in tandem as part of the whole picture from which the jury could have drawn its inferences." Perez, 177 N.J. at 554. In the context of murder, the criminal conduct attempted is purposely or knowingly to cause the death of the victim or serious bodily injury that results in the victim's death. See N.J.S.A. 2C:11-3(1) to (2).

## B.

Case law reveals that attempts at persuasion can constitute conduct for purposes of attempt in appropriate circumstances.

In Perez, this Court evaluated the sufficiency of the State's evidence regarding a conviction for child endangerment based upon attempts to verbally lure a child victim into a car. 177 N.J. at 544. The thirty-four-year-old

17

defendant, while driving his car, pulled close to the thirteen-year-old victim and offered her a ride, repeating his request when she declined. Ibid. In another encounter, he stopped his car and called to the girl, asking her to come over to him. Id. at 544-45. The girl's father reported these interactions to the police, and the defendant was arrested. Id. at 545. On questioning by the police, the defendant stated, "I find her attractive" and "I am obsessed with her, but not like anything out of the ordinary." Ibid.

After the State rested, the "defendant moved under Rule 3:18-1 for a judgment of acquittal, arguing there was insufficient evidence to warrant a conviction" on the charge. Id. at 546. The trial court denied the motion, and the jury found him guilty. Id. at 547.

Recognizing that "attempted child endangerment must be evaluated in accordance with the Code's criminal-attempt statute," this Court considered whether there was sufficient evidence that the defendant took "a 'substantial step' toward the commission of [the] object crime." Id. at 553. The defendant contended the record lacked "any definitive act or statement that indicate[d] criminal intent." Id. at 554. The Court disagreed. Id. at 555. Specifically, "consider[ing the] defendant's words and acts in tandem," jurors may have inferred from his admissions an intent to commit the prohibited act, and that his actions constituted a substantial step toward that act. Id. at 554. The Court

18

held that the State had presented sufficient proofs to support the jury's determination that the defendant's "attempts at luring or enticing [the victim] into his car constituted a substantial step that strongly corroborated his alleged criminal purpose." Id. at 554-55.

Other New Jersey courts have applied a similar words-and-context analysis in holding that conversations aimed at persuading others to commit criminal activities can, under certain circumstances, rise to the level of an attempt to commit those activities.

Indeed, in State v. Jovanovic, a resentencing panel of the Superior Court found that the defendant had taken a substantial step, for purposes of the attempt statute, based on verbal conduct considered in context. 174 N.J. Super. 435, 440-41 (Resent. Panel 1980), aff'd, 181 N.J. Super. 97 (App. Div. 1981). The panel analyzed the evidence to support the particular solicitation at issue after determining that the Legislature intended to make solicitation punishable as an attempt offense under N.J.S.A. 2C:5-1..

The facts of the case showed that defendant, seeking to unburden himself of a building he owned by means of arson, attempted to procure the services of an undercover officer who was "posing as a torch for hire." Id. at 437-38, 440-41. The panel "conclude[d] that the attempt occurred when defendant solicited the detective to burn his building and then engaged in

19

certain conduct in furtherance thereof," such as pointing out "the type of construction of the building," and "the layout of the building," and providing assurances "that the tenants would be safe and that the Fire Department would not pose any risk to a successful fire." Id. at 440. Defendant was ultimately arrested before he had the opportunity to get insurance, sell the building, or pay law enforcement, and was charged with criminal solicitation. Ibid. The panel noted that "[a]ll of these bits and pieces of information [that the defendant passed on] were very valuable to a torchman." Ibid. As a whole, the panel reasoned, the defendant's conduct "was designed to aid the detective in committing arson," "was strongly corroborative of defendant's criminal purpose[,] and also satisfied the 'substantial step' requirement of N.J.S.A. 2C:5-1a(3)." Id. at 440-41.

And, in reaching its holding, the resentencing panel articulated the elements for criminal solicitation charged under the attempt statute:

> (1) a solicitation to commit a crime; (2) an intention that the crime solicited actually be committed; (3) that the solicitor or actor engage in conduct of commission or omission which constitutes a substantial step in a course of action planned to culminate in the commission of the crime solicited; and (4) that the substantial steps taken must be strongly corroborative of defendant's criminal purpose.
>
> [Id. at 441.]

20

Since Javonovic, the Appellate Division has further addressed solicitation's involvement in establishing a substantial step for purposes of an attempted murder charge.

In State v. Urcinoli, the defendant murdered his girlfriend and disposed of her body. 321 N.J. Super. 519, 523 (App. Div. 1999). In flight from police, the defendant went to his uncle's house. Id. at 530-31. There, the defendant told his uncle what he had done. Id. at 531. Following his arrest, while in jail awaiting trial, the defendant met inmate Thomas MacPhee. Id. at 533. The defendant asked MacPhee to kill his uncle when he got out of jail in an attempt to keep his uncle from testifying against him. Ibid. To that end, the defendant promised MacPhee $5000, showed him a bank statement proving he had the money, and provided detailed descriptions of his uncle and family, directions to their home, descriptions of their cars, details about the house, and explanations of their daily routines. Ibid. The defendant and MacPhee also discussed the means through which MacPhee could commit the murder; the defendant suggested MacPhee use a bomb or gun. Id. at 537.

After the State rested, the defendant moved for acquittal on the attempted murder charge regarding his uncle, arguing that the State failed to prove the substantial step element. Ibid. The Appellate Division affirmed the trial court's denial of that motion, finding that "[a] jury could reasonably

21

conclude that by enlisting MacPhee to his evil plan and providing information to assist facilitating its purpose that defendant took substantial steps to further the crime." Ibid.

In State v. Fornino, the defendant conspired to free two prison inmates who were regularly transported out of the prison for medical treatment by killing the guards who accompanied them and setting the inmates free. 223 N.J. Super. 531, 533 (App. Div. 1988). One of the inmates, Satkin, "informed prison officials of the plans and . . . cooperated in gathering evidence." Ibid. One of the conspirators asked Satkin to deliver $10,000 to the defendant as payment for the murder. Ibid. Instead, an undercover officer met with the defendant, and the defendant was arrested after he accepted the money. Id. at 534. The jury found the defendant guilty of a number of charges, including the attempted murder charge he later challenged. Ibid.

On appeal, the defendant argued there was insufficient evidence to find him guilty of attempted murder. Id. at 536. The court disagreed and confirmed his conviction. Id. at 535. Relying in part on statements made by the defendant during his meeting with the officer -- "Problems, problems, you get out of the way. Just get them out of the way. Whatever way you gotta do it you get them out of the way," and "[y] ou know. Like I said before, you know, if you got an obstacle, you get it out of your way. You know, you ah

22

accomplish your goal and ah you ah get all your obstacles out of your way to accomplish your goal, right?" -- the appellate court found that there was ample evidence from which to conclude that the conspiracy included planned murders as well as escape.  Id. at 536-37.

"The more difficult question," the court stated, was "whether the evidence was also sufficient for the jury to conclude that [the] defendant took sufficient steps" toward committing the murder.  Id. at 537.  The court rejected defendant's argument that there was not, finding that his actions were strongly corroborative of his criminal purpose.  Id. at 540.

> [The defendant] had visited the doctors' office where the escape was supposed to occur and had surveyed a wooded area behind the office where the bodies of the murdered guards could be disposed.  Furthermore, he arranged a meeting the night before the planned escape with the person he believed was to pay him for his part in the crime and he in fact accepted the agreed upon payment.
>
> [Id. at 538-39.]

Accordingly, the court concluded that a jury could properly find defendant's actions constituted "substantial steps in a course of conduct planned to culminate in the commission of the crime which were strongly corroborative of the actor's criminal purpose."  Id. at 540 (internal quotations omitted).

23

## V.

With those principles in mind, we consider the totality of the evidence presented to the jury "in a light most favorable to the State," and we give the State "the benefit of all its favorable testimony as well as of the favorable inferences" in determining whether the trial court properly denied defendant's motion for acquittal on the attempted murder charge. Perez, 177 N.J. at 549. Again, when prosecuting a defendant for attempted murder, the State must prove both a criminal purpose and a substantial step toward the commission of the crime. See id. at 553.

We begin by noting the trial court's observation that rarely do you have a victim who survives a shooting come into court to give direct, compelling, and definitive testimony about the horrors she was subjected to by a defendant. It is even rarer to have, in the same case, intercepted phone conversations from a county prison in which a defendant basically admits his guilt in his own words. Considering the rare circumstances in this case, we find that defendant took an intentional substantial step in planning the murder of A.A. during his incarceration. See id. at 554 ("[W]e consider defendant's words and acts in tandem as part of the whole picture from which the jury could have drawn its inferences.").

24

With respect to the criminal purpose element, the record contains sufficient evidence that it was defendant's "conscious object" to have A.A. killed. McCoy, 116 N.J. at 304. The State presented compelling circumstantial evidence of defendant's intent to bring about the death of A.A. in an effort to keep her from testifying against him. See Robinson, 136 N.J. at 483 (criminal purpose focuses "on the intent of the actor to cause a criminal result . . . rather than on the resulting harm"). The recorded phone conversations demonstrate defendant's surprise and fury when A.A. first appeared in court and provided a statement against him. Defendant's several comments -- "he gotta down that, fuck that man them bitches is coming," "fuck outta here ain't nobody understanding my position yo that bitch is still out there running . . . and she's coming to court," and "I wouldn't need a lawyer if [n-word]s was moving and doing what they supposed to be doing the bitch should have been dead already" -- all clearly portray defendant's reaction to A.A. appearing in court and his desperation to have her murdered so that she would not testify against him. The recorded phone calls in evidence exhibited defendant's demanding and purposeful voice, tone, and mannerisms, not mere frustrations and hopes that A.A. would not appear in court to testify against him. The jury, by hearing the recorded phone conversations, could have reasonably inferred defendant's criminal purpose for wanting A.A. dead.

25

Regarding the second element, a jury could reasonably conclude that defendant took a substantial step toward the murder of A.A. when he expressly directed his girlfriend and cousin to contact people to kill A.A., as well as demanding that they post his bail so that he could kill A.A. himself. Specifically, defendant ordered his girlfriend to text an individual named "KG" to inquire as to why A.A. was "still walkin around for?" and that "he gotta down that shit dog," because "she's coming to court." We agree with the State that this conversation allows for a logical inference that defendant's plan to have A.A. killed was already in motion, but not yet accomplished. Furthermore, the response from defendant's cousin that she "can't make them get out there and get busy . . . and do the type of shit that they can do" also bolsters the inference that an order to kill A.A. was already in motion, but his cousin could not force the intended killers to take action immediately, as defendant ordered.

That defendant used other inmates' assigned PIN numbers to make these phone calls from prison is pertinent. It demonstrates his attempt at covering up his efforts to make A.A. unavailable to testify against him. Given that backdrop, defendant's conversations with his girlfriend and cousin were much more than just meaningless vents of frustration "wishing" for A.A.'s demise. Defendant knew that phone calls from jail were recorded and, by using other

26

inmates' PIN numbers, he calculated that his incriminating statements would never be traced back to him.

In all, defendant's demands here were not mere "hopes" or "wishes" that death befall A.A.; rather, defendant was demanding that someone kill A.A. or at least bail him out so he could take that desired action. Defendant's insistent verbal demands in the context of these circumstances corroborated the firmness of his purpose to have the crime carried out, Fornino, 223 N.J. Super. at 538, and are sufficient to satisfy the substantial step requirement for criminal attempt pursuant to N.J.S.A. 2C:5-1(a).

The Appellate Division incorrectly ruled that "[w]ithout evidence of an act by defendant identifying a perpetrator and orchestrating the requisite course of conduct to culminate in the commission of the crime, the State's proofs fall short." Indeed, as we found in Perez, the standard for a substantial step is clear and requires only that the accused's conduct strongly corroborate his or her alleged criminal purpose. 177 N.J. at 553.

We note that in Urcinoli, the Appellate Division held defendant's actions -- where he promised to pay the actor $5000, proved he had the money by providing a copy of his bank statement, provided detailed descriptions of the intended victim and family, directions to their home, descriptions of their cars, details about the house, and explanations of their daily routines -- were all

27

substantial steps toward the attempted crime.  321 N.J. Super. at 537.  And in Fornino, the Appellate Division held that defendant had taken substantial steps when he visited the site where the planned criminal activity was supposed to occur, surveyed a wooded area where the bodies of the murdered victims could be disposed, arranged a meeting with the person he believed was to pay him for his part in the crime, and accepted the agreed upon payment.  223 N.J. Super. at 538-39.

We recognize that this case differs from those cases and lies at the outer edges of proofs to support a substantial step for an attempt charge because it relies on the context and import of defendant's verbal acts.  But, we accept the proofs in this case as sufficient to have presented the attempt charge to the jury.  Although the Urcinoli and Fornino courts were presented with verbal or physical actions beyond the actual solicitations, all that was considered as part of the totality of the circumstances in making the fact-sensitive determination of whether a substantial step had taken place.  The courts did not, however, incorporate those actions into the required showing for a substantial step – that is, they did not set a floor for finding a substantial step.

The Appellate Division's requirement in this case that the State produce such evidence raises the level of proof required to establish a substantial step for criminal attempt.  The Appellate Division's implication that only direct

28

evidence can support a substantial step flies in the face of our jurisprudence, which allows juries to consider the evidence proffered and draw reasonable inferences accordingly. Perez, 177 N.J. at 553 ("The jury was entitled to apply its common sense and experience in evaluating the meaning of defendant's statements. In doing so, it could draw reasonable inferences [about the] defendant's purpose . . . .").

In the case at hand, the State was not required to show that defendant had orchestrated a plan detailing when and how A.A.'s murder was to be carried out. Nor was there a need to show that defendant had provided descriptions of A.A.'s home, cars, or daily routines because, as defendant plainly stated in the recorded phone call, "everybody knows where she's at but nothings going on . . . somebody should of went and downt that bitch already." A jury could reasonably conclude from defendant's statements that, because A.A. was familiar to those persons defendant was enlisting to carry out the murder or his release on bail, defendant had to do nothing further than continue to push to have his orders carried out. Defendant's repeated calls to action from prison to facilitate the murder of A.A. constitute a sufficient basis on which a jury could find a substantial step for purposes of criminal attempt. See N.J.S.A. 2C:5-1 (a person is guilty of criminal attempt when he or she "[p]urposely does . . . anything which, under the circumstances as a reasonable

29

person would believe them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime").

Additionally, defendant's plan for his cousin to bail him out so that he could kill A.A. himself can also constitute a sufficient basis for a jury to find a substantial step for criminal attempt. Defendant clearly and repeatedly demanded that his cousin bail him out so that he could "handle what [he] gotta handle" -- that is, to kill A.A. -- and that it did not matter "if [he] was out here for one day or one week . . . [his] case will be better." Those utterances also strongly corroborate his alleged criminal purpose to murder A.A. so that she would not appear in court to testify against him. Perez, 177 N.J. at 553.

Context is important for finding the verbal acts sufficient enough in this matter. Defendant's decrees here -- 1) instructing his girlfriend to text someone on his behalf to carry out the murder of A.A., 2) directing his cohorts to carry out the murder of A.A., and 3) demanding that his cousin post bail to briefly release him from jail so that he could carry out the murder himself -- were designed to prompt actions that could not be undertaken by defendant himself due to his incarceration. Common sense compels the recognition that the fact that defendant's actions in furtherance of his criminal purpose relied on the use of a conduit, in light of his imprisonment, does not render his substantial steps meaningless. The jury here was entitled to apply its common

sense and experience to interpret defendant's words and actions to determine his intent.  <u>Perez</u>, 177 N.J. at 554.

The State presented sufficient evidence for the jury to conclude that defendant took substantial steps to accomplish his plan.  <u>Id.</u> at 554-55. Defendant's actions permitted the jury to draw reasonable inferences and conclude that defendant's actions throughout his telephone calls, and how accomplished, together provided the necessary "substantial step" to be charged again with attempted murder.

In conclusion, we agree with the trial judge's determination that based on the rare circumstances in this case, there was sufficient evidence for the jury to have concluded that defendant took substantial steps toward a second attempt on the victim's life.

## VI.

We therefore reverse the Appellate Division's decision and reinstate defendant's conviction on the second charge of attempted murder.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.

31