# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1235-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

S.B.,

    Defendant-Appellant.

_____

Submitted March 23, 2021 – Decided April 27, 2021

Before Judges Yannotti, Mawla, and Natali

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 14-09-0629.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Catlin A. Davis, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant S.B. was found guilty of participating in a "youth serving organization," in violation of N.J.S.A. 2C:7-23.[1] He was sentenced to five years in State prison and required to serve the sentence consecutive to a sentence previously imposed in Middlesex County. Defendant appeals from the judgment of conviction (JOC) dated October 3, 2019. We affirm.

I.

Defendant has two prior convictions for sexually assaulting teenagers, and he is subject to the provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23, which include registration with local law enforcement agencies, community notification, and prohibitions on his interaction with children. S.B. was a member of the Eternal Life Christian Center (ELCC), a registered non-profit, religious institution. He participated in ELCC's No Limits Youth Ministry (NLYM), whose mission was "to prepare students to be effective" at home and in school.

Based on his involvement with NLYM, a Somerset County grand jury charged defendant with participation in a "youth serving organization" in violation of N.J.S.A. 2C:7-23. Defendant filed a motion to dismiss the

---

[1] We use initials to identify defendant and others to protect the identities of persons who were found to be victims of sexual offenses. See R. 1:38-3(c)(12).

indictment. He argued that NLYM was not a "youth serving organization" under the statute. The trial court agreed and dismissed the indictment. The State appealed and we affirmed, finding that Legislature did not intend to include religious organizations within the statutory definition of a youth serving organization. State v. S.B., 445 N.J. Super. 49, 58-59 (App. Div. 2016).

The Supreme Court reversed, reinstated the indictment, and remanded the matter for further proceedings. State v. S.B., 230 N.J. 62, 72 (2017). The Court held that "a religious institution is not categorically excluded from the definition of 'youth serving organization' under N.J.S.A. 2C:7-22." Id. at 70. The Court stated that "[o]n remand, it will be a question for the trier of fact whether the NLYM constitutes a youth serving organization." Id. at 72.

Thereafter, Judge Kevin M. Shanahan granted defendant's motion to waive his right to a jury trial and conducted a bench trial on the charge. At the trial, defendant did not dispute that he was an "excluded sex offender" under N.J.S.A. 2C:7-22.[2] He asserted, however, that NLYM was not a youth serving

---

[2] The statute defines "excluded sex offender" as "a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for the commission of a sex offense, as defined in [N.J.S.A. 2C:7-2], which involves a victim under [eighteen] years of age."

organization, as defined in N.J.S.A. 2C:7-22, and that he did not "knowingly" participate in such an organization.

The State presented evidence indicating that while defendant was incarcerated as a result of his convictions for sexual assault, he participated in ELCC's prison ministry. ELCC provides inmates and their families with religious and charitable services and encourages inmates to continue their Christian fellowship after they are released from prison.

When defendant was released from prison, he registered as a sex offender with his local law enforcement agency, as required by Megan's Law, and since that time, he has complied with the Megan's Law registration requirements. Defendant was an active congregant of ELCC and eventually become involved in a variety of roles in the church, serving as a leader of the youth ministry and a member of the church's executive board.

Because defendant had participated in ELCC's prison ministry, ELCC's leaders knew defendant had spent time in prison. However, in 2005, after new members were elected to ELCC's board, it reviewed a file that included defendant's criminal history, and certain board members became concerned about defendant's active role in ELCC's youth ministry.

4

Glenn Solomon, who was a board member at the time, testified that after reviewing defendant's file, the board decided to adopt policies prohibiting defendant from being involved with ELCC's youth ministry and being alone with any of the youth members. Defendant was informed of the board's decision, and, according to Solomon, defendant complied with the board's policies from 2005 to 2008.

Solomon testified, however, that between 2008 and 2010, ELCC went through what he described as a chaotic leadership transition. During this time, ELCC had multiple pastors as well as new board members. According to Solomon, the board's policies regarding defendant's involvement with the youth ministry and youth members were not enforced, and defendant again began to participate actively in the youth ministry.

At that time, the youth ministry was reorganized under the name NLYM. It was created to provide church members between the ages of twelve and seventeen with spiritual education, social and recreational activities, as well as a community setting to foster personal and religious growth. NLYM organized weekly bible study meetings, social events, and recreational activities such as trips to movies, amusement parks, concerts, and overnight camp retreats.

A-1235-19

Reverend Marcus Jackson, Jr., was the Youth Director of NLYM from 2006 to 2016. He testified that from 2009 to 2014, defendant was a youth leader, chaperone, and mentor for the young participants in NLYM. Jackson explained that, as a youth leader, defendant was responsible for supervising the participants during weekly meetings and facilitating discussions and activities as a part of the ministry's goal to inspire the participants' faith.

In addition to their responsibilities at NLYM's weekly meetings, youth leaders acted as chaperones on trips and offsite camp retreats. Jackson said that from 2008 to 2013, defendant was a chaperone at the camp retreats. He specifically recalled defendant's participation in at least one NLYM camp in 2010 and 2011.

Jackson testified that during the retreat, defendant's responsibilities included driving the participants to the camp, helping set up the campsites, leading activities and games, and facilitating group discussions. He said that while chaperoning the camps, defendant would sleep in the same quarters as the young male students.

Two of the NLYM youth participants testified regarding defendant's role as a leader and chaperone for NLYM. H.S. testified that she joined the ministry when she was twelve years old and continued her membership until she was

eighteen years old. She said the youth leaders were more like mentors than chaperones, and defendant was known amongst the teenagers as a leader to whom they could reach out if they had questions. H.S. stated that defendant occasionally led the Friday night meetings, and he was present as a leader and chaperone at all three camp trips she attended between 2012 and 2014.

B.H. testified that she was a member of NLYM from around 2012 to 2015. She identified defendant as a leader in NLYM in 2013 to 2014. According to B.H., defendant participated in weekly meetings and two retreats that she attended. In addition to viewing defendant as a mentor and chaperone type figure, B.H. recalled thinking he assisted Jackson in leading NLYM.

B.H.'s mother, M.B., also testified. She said she remembered thinking defendant was one of the leaders of NLYM, along with Jackson. M.B. stated that defendant would conduct some of the sermons and services when Jackson was not available. She testified that defendant was often a chaperone for NLYM's activities and retreats.

From 1996 to 2014, Lieutenant Gerard Clyne was a detective with the North Plainfield Police Department. He was the person responsible for registering sex offenders in the community, pursuant to Megan's Law. Clyne testified that in 2009, the Legislature amended Megan's Law and enacted

7

N.J.S.A. 2C:7-23, which prohibited excluded sex offenders from participating in youth serving organizations.

Clyne said that after N.J.S.A. 2C:7-23 was enacted, he was responsible for providing Megan's Law registrants with the form "Notice of Prohibition from Participation in Youth Serving Organization" and having them sign the form. He explained that the form stated that registrants were prohibited by statute from being involved with a youth serving organization.

Clyne testified that on November 20, 2012, he met with defendant to have him sign the form. During the meeting, Clyne read the entire form to defendant. It included language from N.J.S.A. 2C:7-23(a), explaining the prohibition against participation in a youth serving organization. The form also included the statutory definition of a youth serving organization.

Clyne stated that in addition to reading the form to defendant verbatim, he told defendant the statute "basically bans you from working with kids." Clyne asked defendant if he had any questions about the form. Clyne said defendant appeared to understand the form, and he did not ask Clyne any questions.

Clyne further testified that if defendant had informed him about his participation in NLYM, or if defendant had asked if he could participate in any religious activities such as the youth ministry, he would have screened

8

defendant's participation with the prosecutor's office. On cross-examination, Clyne stated that defendant had always been truthful and cooperative regarding the Megan's Law registration requirements.

Sergeant Richard Evans of the Hillsborough Township Police Department testified that in 2014, he was responsible for registering sex offenders pursuant to Megan's Law. Defendant moved to Hillsborough that year and on April 1, 2014, he met with Evans at police headquarters to complete the registration process, which included review of the form notice of the prohibition on participation in a youth serving organization.

Evans testified that he first explained the form to defendant and informed him he could not "have any interactions with organizations or groups involving kids." Evans then read the entire form to defendant, pausing to ask if he understood the definition of a youth serving organization. Defendant said he understood the definition and he signed the form.

Evans stated that defendant did not ask any questions about the form, nor did he mention his participation with the youth ministry. He testified that if defendant had asked about participation in the youth ministry, he would have contacted the prosecutor's office to determine if defendant's participation was prohibited.

9

Detective Emma Bascom of the Franklin Township Police Department testified that she was assigned to investigate an allegation that defendant was participating in a youth serving organization in violation of N.J.S.A. 2C:7-23. During her investigation, Bascom interviewed several members of ELCC's congregation and executive board. She also searched certain social media sites for information about the church and NLYM.

On one of NLYM's social media sites, Bascom found photographs that showed defendant engaging in various activities with youth members of the organization at what appeared to be a camp. Jackson confirmed that the pictures were taken while defendant was a chaperone and leader at the NLYM camps in 2010 and 2011.

In addition to the photographs, Bascom collected a series of emails from 2011 that Jackson sent to the church's leaders and members of NLYM. The emails discussed a variety of topics, including scheduling and general updates for adult and student leadership within the organization. Bascom asked Jackson why the emails were sent to defendant, he replied, "[b]ecause he's on our youth leadership team."

Defendant did not testify. However, he called Daryl Perkins, who was the senior pastor at ELCC beginning in 2008. Perkins testified that he served as

10

President of ELCC's board and senior pastor of the church. He also was an ex officio member of all church committees and served as principal of the church's school.

Perkins testified that ELCC was organized into different ministries, which were essentially programs. ELCC had programs for young adults and teenagers, and each program has a volunteer facilitator or leader. He stated that the youth ministry is a recognized part of ELCC. Perkins explained that Jackson had been running the youth ministry when Perkins became a pastor at the church.

Perkins said the youth ministry would have meetings each week. He stated that after April 2008, he requested that criminal background checks be performed for volunteers working in the youth ministry and, at a minimum, every two years thereafter. He testified that the background checks had been conducted regularly during the preceding four or five years.

Perkins testified that after he became senior pastor, the executive board called a special meeting to remove defendant from the board based on information in a file, which Perkins could not recall. He said the purpose of the file was to show defendant had a history of inappropriate sexual contact. Perkins spoke with defendant and he confirmed his criminal history.

A-1235-19

Perkins did not remove defendant from the board because he did not believe there was any basis for doing so. He stated, however, that the board placed restrictions on defendant's interaction with youth. Perkins explained that defendant was not allowed to be in any facility with females under the age of eighteen, unless another adult was present. Perkins said he reviewed these restrictions with defendant.

Perkins testified that defendant was involved in numerous church activities, and he had responsibilities related to the youth ministry. He noted that the youth ministry conducted "enrichment camps," and defendant was one of the persons who went to the camps. Defendant also would attend youth group meetings at the church.

Perkins stated Jackson never told him that defendant was on the leadership team for the youth ministry. He said the youth ministry did not have its own insurance, bank accounts, or tax identification number.

On cross-examination, Perkins stated that defendant has been a member of the church for about twenty years, and Perkins knew him during that time. According to Perkins, defendant was a volunteer and helped the church in many ways. Perkins said that as lead pastor, he was in charge of everything that went on in the church.

A-1235-19

Perkins testified that the youth ministry would meet on Wednesday and Friday evenings. He said he did not attend those meetings regularly and did not know if defendant attended meetings every Friday night. Perkins stated that the ministry also had annual camps, however, he never attended these camps. He said Jackson was the person who ran the youth ministry, and prior to 2014, defendant helped Jackson with that program.

After the parties completed the presentation of evidence, defendant moved for a judgment of acquittal pursuant to Rule 3:18-1. Judge Shanahan denied the motion. The judge found that the State had presented sufficient evidence from which a reasonable jury could find defendant guilty of the charged offense. The attorneys then presented their closing arguments.

On May 20, 2019, Judge Shanahan issued an oral opinion. The judge noted that the parties had stipulated that defendant was an "excluded sex offender" under N.J.S.A. 2C:7-22. The judge then found, based on the evidence and testimony presented at trial, that NLYM is a youth serving organization as defined in N.J.S.A. 2C:7-22.

The judge further found that defendant "knowingly participated" in what he knew to be a prohibited youth serving organization. The judge stated that the evidence established that "defendant was heavily involved in NLYM." The

judge noted that after the enactment of N.J.S.A. 2C:7-23, defendant was twice made aware of the statutory prohibition on his participation in a youth serving organization. Despite those notifications, defendant continued to participate as a leader and chaperone of NLYM. The judge concluded the State had proven beyond a reasonable doubt that defendant had knowingly participated in NLYM in violation of N.J.S.A. 2C:7-23.

Judge Shanahan sentenced defendant on September 20, 2019, and thereafter, the judge filed the JOC dated October 3, 2019. This appeal followed. On appeal, defendant argues:

> POINT I
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE THE STATE ADDUCED NO EVIDENCE TO COUNTER DEFENDANT'S REASONABLE BELIEF THAT THE YOUTH MINISTRY WAS A RELIGIOUS ORGANIZATON EXEMPT FROM THE DEFINITION OF "YOUTH SERVING ORGANIZATION" UNDER N.J.S.A. 2C:7-22.
>
> POINT II
> THE COURT ERRED IN IMPOSING A SENTENCE CONSECUTIVE TO THE SENTENCE DEFENDANT WAS ALREADY SERVING IN MIDDLESEX [COUNTY] BECAUSE BOTH MATTERS OVERLAPPED AND AROSE FROM THE SAME SET OF CIRCUMSTANCES.

## II.

As noted, defendant argues that the trial judge erred by denying his motion for a judgment of acquittal. He claims he reasonably believed NLYM was a religious organization, which was not a prohibited youth serving organization under N.J.S.A. 2C:7-22.

On appeal, the grant or denial of a motion for a judgment of acquittal is reviewed de novo, and we apply the same standard the trial court applies in ruling on the motion. State v. Jones, 242 N.J. 156, 168 (2020) (quoting State v. Williams, 218 N.J. 576, 593-94 (2014)). The motion should be granted only when "the evidence is insufficient to warrant a conviction." R. 3:18-1.

Moreover, the motion should be denied if "based on the entirety of evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Williams, 218 N.J. at 594 (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).

Therefore, we review "the State's evidence in its entirety, be that evidence direct or circumstantial." Jones, 242 N.J. 168 (quoting Reyes, 50 N.J. at 459). The court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State."

15

State v. Brown, 463 N.J. Super. 33, 48 (App. Div. 2020) (quoting State v. Papasavvas, 170 N.J. 462, 521 (2002)).

As noted previously, defendant does not dispute he is an "excluded sex offender" under N.J.S.A. 2C:7-22. Therefore, the State was required to prove that the NLYM is a youth serving organization as that term is defined in N.J.S.A. 2C:7-22.

Because N.J.S.A. 2C:7-23 does not include the culpable mental state required for conviction, N.J.S.A. 2C:2-2(c)(3) applies. The statute provides that

> [a]lthough no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime with the culpability defined in paragraph [(b)(2)]of this section. This provision applies to offenses defined both within and outside of this code.
>
> [N.J.S.A. 2C:2-2(c)(3).]

In addition, paragraph (b)(2) of N.J.S.A. 2C:2-2 states that

> [a] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with

16

respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

A.  Did the State present sufficient evidence to establish that NLYM a youth serving organization?

The statute provides that a "youth serving organization" is "a sports team, league, athletic association or any other corporation, association or organization, excluding public and nonpublic schools, which provides recreational, educational, cultural, social, charitable or other activities or services to persons under [eighteen] years of age." N.J.S.A. 2C:7-22.

The testimony presented at trial shows that NLYM was established to provide certain programs for youth members of the church, who were between the ages of twelve and seventeen. NLYM's programs provide its youth members with spiritual, educational, social and recreational activities, and a community setting.

NLYM organized weekly meetings, social events, and recreational activities such as trips to movies, amusement parks, concerts, and overnight camp retreats. NLYM also organized various fundraising events. The programs were intended to foster personal and religious growth of its youth members.

A-1235-19

We are convinced the State presented sufficient evidence to allow a reasonable trier of fact to find the State had proven, beyond a reasonable doubt, that NLYM was a youth serving organization under N.J.S.A. 2C:7-22.

B.    Did defendant knowingly participate in a "youth serving organization" in violation of N.J.S.A. 2C:7-23?

Defendant contends he did not knowingly participate in an organization that met the definition of a youth serving organization as defined in N.J.S.A. 2C:7-22. Defendant asserts that his actions clearly demonstrated he believed his participation in ELCC's youth ministry was not prohibited by N.J.S.A. 2C:7-23.

Defendant notes that the trial court and this court had determined that the youth ministries operated by religious organizations were not prohibited youth serving organizations under N.J.S.A. 2C:7-23, but the Supreme Court reached a different conclusion in S.B. He asserts that where "learned legal minds" could disagree as to the interpretation of the statute, it was "eminently reasonable" for him to believe that his participation in a religious youth organization like NLYM was not prohibited.

Defendant's argument is without merit. As noted, N.J.S.A. 2C:7-23 does not include a culpable mental state. Therefore, N.J.S.A. 2C:2-2(c)(3) applies to fill the gap in the statute, and the culpability defined in N.J.S.A. 2C:2-2(b)(2)

18

applies "to some or all of the material elements" of the offense. Thus, the culpable mental state that applies is "knowingly." Ibid.

We are convinced the State was required to prove, beyond a reasonable doubt, that defendant "knowingly" participated in the activities of NLYM. The State was also required to prove, beyond a reasonable doubt, that NLYM was a youth serving organization as defined in N.J.S.A. 2C:7-22. However, the State was not required to prove defendant knew, in fact, that NLYM met the definition of a youth serving organization under the statute.

Our decision in State v. Bryant, 419 N.J. Super. 15 (App. Div. 2011), supports this interpretation of the statute. In Bryant, the defendant pled guilty to endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4(a). Id. at 17. The statute makes it unlawful for a person, with a legal duty to care for a child, to engage in sexual conduct "which would impair or debauch the morals of the child . . . ." N.J.S.A. 2C:24-4(a).

The endangering statute does not, however, include a culpable mental state. Bryant, 419 N.J. Super. at 22. Therefore, "knowingly," as defined in N.J.S.A. 2C:2-2(b)(2), is the "required mental element" for conviction of the offense. Id. at 22-23. In Bryant, we noted that "N.J.S.A. 2C:2-2(c) does not require the gap filler mens rea standard of 'knowingly' to apply to all elements

19

of the offense." Id. at 24-25. We also noted that determination of which elements of the offense require proof that the defendant acted "knowingly" turned on the interpretation of the statute and Legislative intent. Id. at 25.

In Bryant, we held that the "knowingly" requirement applies to whether defendant engaged in "sexual conduct" with a child. Id. at 24-25. We noted that some forms of sexual behaviors are "obviously of a sexual nature" and an individual "cannot engage in such conduct without a recognition that it is sexual in nature." Id. at 24.

We stated that certain other forms of behavior "are more ambiguous in their nature" and the actor may not understand that such behavior constitutes "sexual conduct." Ibid. We concluded that "the Legislature would have intended to require proof that the defendant knowingly engaged in sexual conduct." Ibid.

We reasoned, however, that there was "considerable doubt" that the Legislature intended "to require proof that a defendant knew his conduct would impair or debauch the child's morals, as such a construction would weaken the very protection of children that the Legislature has for decades striven to achieve." Id. at 27. We therefore held "that the second element of the statute, 'conduct which would impair or debauch the morals of a child,' can be satisfied

20

without proof that the defendant was aware his conduct would cause such a result." Id. at 27-28.

Like the statute at issue in Bryant, N.J.S.A. 2C:7-23(a) is intended to protect children. "The Legislature's primary objective in enacting Megan's Law was to create a registration system that provided law enforcement officials 'with additional information critical to preventing and promptly resolving' incidents of child sexual abuse." S.B., 230 N.J. at 69 (quoting N.J.S.A. 2C:7-1).

In 2009, when N.J.S.A. 2C:7-23 was enacted, "the sponsor's statement made it clear that the purpose of the amendment was to cast a wide net in order to 'protect the children and youth of this State by prohibiting sex-offenders from holding positions in youth serving organizations.'" Id. at 70 (quoting Sponsor's Statement to S. 532 3 (L. 2009, c. 129)). Based on this goal, "[a]ny ambiguity would have been interpreted in a manner favoring the protection of children to effectuate the statute's legislative intent." Ibid.

Thus, requiring proof that defendant knew NLYM was, in fact, a prohibited youth serving organization would likely "weaken the very protection of children that the Legislature" was attempting to achieve. Bryant, 419 N.J. Super. at 28. We therefore conclude that the Legislature would not have intended to apply the "knowingly" mental state to that element of the offense.

Nevertheless, we are convinced that the State presented sufficient evidence to show that defendant knowingly participated in a youth serving organization and he was prohibited from doing so. As stated previously, at trial, Clyne and Evans both testified that they met with defendant and told him he was prohibited from participating in a youth serving organization.

The officers read defendant the form notice, which included the statutory definition of a prohibited youth serving organization. That definition does not include an exemption for youth ministries conducted by religious organizations. Clyne also told defendant the statute "basically bans [him] from working with kids," and Evans told him he could not "have any interactions with organizations or groups involving kids."

Defendant did not ask Clyne or Evans any questions regarding the form. He did not mention his participation in NLYM, even though he was a "youth leader" of that organization and it was a ministry that provided services to children. Moreover, defendant knew that the ELCC's board had precluded him from participating in the youth ministry due to his criminal history, which included sexual offenses involving teenage victims.

We are therefore convinced that viewing all of the evidence presented and giving the State the benefit of all favorable testimony and inferences that could

22

be drawn from that evidence, a reasonable factfinder could find that defendant knew the NLYM was a prohibited "youth serving organization." Accordingly, the trial judge did not err by denying defendant's motion for a judgment of acquittal.

## III.

Defendant also argues that the trial judge erred by sentencing him to a consecutive sentence. We disagree.

Here, the trial judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge also found mitigating factor four, N.J.S.A. 2C:44-1(b)(4) (substantial grounds tending to excuse or justify defendant's conduct, though not a defense). Ultimately, the judge found that the aggravating factors outweighed the single mitigating factor.

The judge sentenced defendant to a five-year prison term and ordered him to serve the sentence consecutive to a sentence imposed in Middlesex County on Indictment No. 17-02-0140, which defendant was serving. The judge noted

23

that in the Middlesex County case, defendant had been sentenced to a five-year prison term, with two-and-one-half years of parole ineligibility.

When reviewing a trial court's sentencing determination, we apply a deferential standard of review. State v. Fuentes, 217 N.J. 57, 70 (2014). "The reviewing court must not substitute its judgment for that of the sentencing court." Ibid. (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Our review is limited to consideration of:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

Here, defendant argues that the judge erred by requiring him to serve his sentence consecutive to the Middlesex County sentence. The record shows that in 2018, defendant was found guilty of fourth-degree criminal sexual contact, in violation of N.J.S.A. 2C:14-3(b); and third-degree endangering the welfare of a child by engaging in sexual conduct, in violation of N.J.S.A. 2C:24-4(a)(1). The victim of these offenses was a youth member of NLYM.

24

Judge Shanahan considered the factors for imposing a consecutive sentence established in State v. Yarbough, 100 N.J. 627, 643-44 (1985):

(1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .[3]

In his decision, Judge Shanahan noted that under Yarbough, "there can be no free crimes in [a] system for which the punishment shall fit the crime."  He stated that the purpose of Megan's Law and the enactment of N.J.S.A. 2C:7-23(a) were to preclude precisely what occurred in this case.  An excluded sex offender had participated in a youth serving organization and engaged in unlawful sexual conduct with one of the youth members of the organization. The statute was intended to prohibit this conduct.

Although Judge Shanahan acknowledged that the offenses were not wholly independent of one another, he found the crimes and their objectives were predominately independent from each other.  The judge noted that defendant had committed the offenses at different times and in separate places, and they were not committed "so closely in time and place as to indicate a single period of aberrant behavior."

The judge pointed out that defendant's unlawful participation in NLYM occurred over a long period of time and involved numerous victims.  The judge

---

[3]  Yarbough included a sixth guideline placing an "outer limit" on the cumulation of consecutive sentences. Id. at 644.  This guideline was eliminated by an amendment to N.J.S.A. 2C:44-5(a) enacted in 1993. L. 1993, c. 223, § 1.

found that "[e]ach and every child . . . [who] was supervised and came under the control, whether at camp or whether . . . at ministry[,] of [defendant] is a victim." The judge concluded a consecutive sentence was warranted.

Defendant argues, however, that this offense and those committed in Middlesex County had the same objective. According to defendant, the crimes were inextricably intertwined, and they were not predominantly independent from each other. He contends the judge failed to address the second Yarbough factor, which he asserts does not apply because the offenses allegedly did not involve "separate acts of violence or threats of violence."

Defendant also contends his wrongful participation in NLYM continued until April 2014, and the offenses in Middlesex County occurred in July 2014. He therefore argues the offenses constitute a single period of aberrant behavior. In addition, defendant asserts that the judge erred by finding all youth participants in NLYM were victims, and failing to address all of the Yarbough factors.

We find no merit in these arguments. The judge properly considered the relevant Yarbough factor, and the court must apply the Yarbough factors "qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001). Moreover, a consecutive sentence may be imposed "even though a majority of

27

the Yarbough factors support concurrent sentences." Id. at 427-28. We are convinced the record supports the judge's findings, and the judge's decision to impose a consecutive sentence for defendant's violation of N.J.S.A. 2C:7-23(a) was not a mistaken exercise of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1235-19